626 F.2d 997
 58 A.L.R.Fed. 764, 200 U.S.App.D.C. 133,
1982-83 Trade Cases 65,171
 NATIONAL DISTRIBUTING COMPANY, INC., d/b/a Consolidated
Seaboard Distributors, Petitioner,
v.
UNITED STATES TREASURY DEPARTMENT, BUREAU OF ALCOHOL,
TOBACCO AND FIREARMS, Respondent.
 No. 78-2303.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 3, 1979.
Decided April 22, 1980.
 
 Abraham M. Buchman, Washington, D.C., a member of the bar of the District of Columbia Court of Appeals, pro hac vice, by special leave of court, with whom John W. Coggins, Washington, D.C., was on brief, for petitioner.
 Ron Landsman, Atty., Dept. of Justice, Washington, D.C., with whom John J. Powers, III and Michael J. Pugh, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondent. J. Mark Manner and Robert B. Nicholson, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondent.
 Before WRIGHT, Chief Judge, ROBB, Circuit Judge, and CORCORAN,* Senior District Judge.
 Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.
 J. SKELLY WRIGHT, Chief Judge:
 
 
 1
 This case raises the question whether the so-called "tied house" provision of the Federal Alcohol Administration Act, Section 5(b), 27 U.S.C. § 205(b) (1976), prohibits the sale of wine by a wholesaler at a price substantially below cost, pursuant to a published price offer valid throughout a sales area, where the purchaser makes no agreement, express or implied, concerning future sales or other matters. Jurisdiction of this court is invoked under 27 U.S.C. § 204(h) (1976).
 
 I. BACKGROUND
 
 2
 The facts are undisputed.[1] Petitioner National Distributing Company, d/b/a Consolidated Seaboard Distributors (National), sells wine and other alcoholic beverages at wholesale in portions of Florida, Georgia, and California. Its territory includes Tallahassee, Leon County, Florida. National is an authorized supplier[2] of Lancers wine in Leon County by virtue of designation by a division of Heublein, Incorporated, the brand owner. A competitor of National in the Leon County Market is Seminole Distributors, but Seminole is not authorized as a dealer by Heublein, and must procure its Lancers wine from a Pensacola dealer.[3]
 
 
 3
 On January 15, 1976 National's wine manager for the district including Leon County sent a circular to wine retailers in Leon County informing them that all flavors and sizes of Lancers wine would be available at a discount of $20 per case. This price was approximately $10 per case less than the total cost to National.[4] The offer was made to all retailers in the area without discrimination, with no conditions, restrictions, or quantity limitations. During February 1976 National sold up to 250 cases of Lancers wine at the discount price to retailers in Leon County. At the end of the month National's acting general manager for the district discovered the existence of the discount offer and immediately cancelled it. He later testified that the below-cost sale was a "mistake"[5] and contrary to company policy.[6]
 
 
 4
 As a result of the low-price offer, several retailers that formerly had purchased Lancers wine from both National and Seminole purchased their supplies solely from National. The record does not make clear the extent or duration of the adverse effect on Seminole's sales. The parties stipulated that three supermarket retailers of Lancers wine did not buy from Seminole from February 1976 until the date of the stipulation, June 16, 1977,[7] but there is no evidence of what happened after that time or what happened with respect to the more than 100 other licensed retailers in Leon County.[8] Moreover, the Administrative Law Judge (ALJ) in the case noted for the record that Seminole's basic permit had been suspended because of unfair trade practices[9]; this may account for some portion of the decline in Seminole's sales volume. The ultimate effect of National's temporary below-cost sales on Seminole's business is not, therefore, established on this record.
 
 
 5
 On April 12, 1977 the Southeast Regional Regulatory Administrator of the Bureau of Alcohol, Tobacco and Firearms of the United States Department of the Treasury (Bureau) issued National an order to appear before an ALJ to show cause why its permit should not be suspended. The order alleged that National's below-cost sales of Lancers wine violated Section 5(b) of the Federal Alcohol Administration Act (Act), 27 U.S.C. § 205(b) (1976).[10] National made a motion to dismiss the proceeding,[11] which the ALJ denied.[12] A hearing was then held on the basis of stipulated facts.[13] Two disputed legal issues were decided by the ALJ: first, whether National's below-cost sales violated the Act and, second, whether any such violation was willful. He decided both questions in the affirmative and therefore suspended National's operating permit for three days.[14] On October 31, 1978 the ALJ's initial decision was affirmed by the Acting Director of the Bureau.[15] This appeal followed.
 
 
 6
 After this appeal was filed but before oral argument was heard, the Fifth Circuit handed down a decision relevant to this case. In Castlewood International Corp. v. Simon, 596 F.2d 638 (5th Cir. 1979), the court held that the Bureau's interpretation of Section 5(b) of the Act, as reflected in ATF Ruling 74-6, 1974 ATF C.B. 50, is invalid in Florida under the Twenty-first Amendment because it conflicts with state law, which must prevail under the constitutional division of authority over the alcoholic beverage industry. National contends that, since the events leading to the case at bar occurred entirely in the State of Florida, "Castlewood is determinative on the question of Appellant's guilt * * *." Appellant's Memorandum Regarding Castlewood International Corporation v. Simon at 1. The Bureau has filed a petition for certiorari sub nom. Miller v. Castlewood International Corp., No. 79-1156, 48 U.S.L. Week 3490 (February 5, 1980).
 
 
 7
 In our view, the Castlewood decision is not "determinative" in this appeal. The Fifth Circuit has remanded the case to the District Court for entry of an order granting declaratory and injunctive relief; we do not know what the scope of that relief will be, or whether such relief will cover the circumstances of this case. We also do not know whether the Supreme Court will decide to review the case, or whether the Fifth Circuit's decision would survive such review. Moreover, we are able to decide this case on the basis of federal law, without touching on the constitutional issues raised in Castlewood. Our disposition of the case therefore does not conflict with, nor does it rely upon, the Castlewood decision. Our holding will be unaffected by any decision the Supreme Court may make on certiorari, since the reasoning we follow in this case is unrelated to questions of Florida state law or the Twenty-first Amendment. We therefore proceed to the merits of this case.
 
 II. THE STATUTE
 
 8
 The Federal Alcohol Administration Act, 27 U.S.C. §§ 201-212 (1976), provides that persons importing, producing, distilling, rectifying, blending, bottling, or wholesaling wine or alcoholic beverages must obtain a permit from the Bureau.[16] Such permits are conditioned upon compliance with certain substantive provisions of the Act, with the Twenty-first Amendment, and with other federal laws relating to the alcohol industry.[17] The Act prohibits or regulates, among other things consignment sales, misleading labelling or advertising, retail bulk sales, and interlocking directorates.[18] The "tied house" provision, with which we are concerned, is one of three provisions in Section 5 of the Act, 27 U.S.C. § 205, designed to prevent producers, importers, and wholesalers from engaging in certain practices that might induce retailers to purchase products "to the exclusion in whole or in part" of products from other producers, importers, and wholesalers in interstate commerce, where the "direct effect" of the prohibited practice is "to prevent, deter, hinder, or restrict other persons from selling or offering for sale any such products to such retailer in interstate or foreign commerce (.)" Id. § 205(a), (b), & (c).
 
 
 9
 The practice prohibited by subsection (a) is entitled "Exclusive outlet," and is described as "(t)o require, by agreement or otherwise," the proscribed exclusion. Id. § 205(a).[19] The practice prohibited by subsection (c) is entitled "Commercial bribery," and is described as "(t)o induce" the proscribed exclusion "(1) (b)y commercial bribery; or (2) by offering or giving any bonus, premium, or compensation to any officer, or employee, or representative" of the retailer. Id. § 205(c).[20] The practice with which National is charged, found in subsection (b), is entitled " 'Tied house,' " and is described as "(t)o induce" the proscribed exclusion
 
 
 10
 (1) (b)y acquiring or holding * * * any interest in any license with respect to the premises of the retailer; or (2) by acquiring any interest in real or personal property owned, occupied, or used by the retailer in the conduct of his business; or (3) by furnishing, giving, renting, lending, or selling to the retailer, any equipment, fixtures, signs, supplies, money, services, or other thing of value, subject to such exceptions as the Secretary of the Treasury shall by regulation prescribe * * *; or (4) by paying or crediting the retailer for any advertising, display, or distribution service; or (5) by guaranteeing any loan or the repayment of any financial obligation of the retailer; or (6) by extending to the retailer credit for a period in excess of the credit period usual and customary to the industry for the particular class of transactions * * *; or (7) by requiring the retailer to take and dispose of a certain quota of any such products(.)
 
 
 11
 Id. § 205(b).[21] If the Secretary finds that the permit holder has willfully violated any of these conditions, he shall, after notice and hearing, revoke or suspend the license.[22]
 
 
 12
 The Bureau has taken the position that a sale by a wholesaler to a retailer at less than "laid-in cost"[23] constitutes a prima facie violation of the tied house provision, and may be punished by suspension or revocation of permit unless the wholesaler can specifically justify the discounted price.[24] The justifications honored by the Bureau are "the introduction of new products, the promotion of slow-moving items, and the passing on of costs savings to the retailer." Decision of the Acting Director, App. 73. The Bureau reaches this conclusion by defining a below-cost sale as "giving * * * to the retailer * * * supplies, money, services, or other thing of value(.)" See 27 U.S.C. § 205(b)(3). Although the Bureau recognizes that "the purpose of any pricing transaction will generally be to induce purchases," App. 75, and thus in effect to exclude purchases from other wholesalers,[25] it stated that "it is also clear that there is some point where such a transaction transgresses the boundary of a competitive practice sanctioned by the Act and becomes a proscribed inducement * * * . A sale below laid-in cost, without * * * justification, * * * is such a practice." Id. The Bureau reasoned that the transaction must be construed as "the furnishing or giving of money or something of value to the retailer of the difference in the amount paid by the wholesaler for the product and what the product is sold for to the retailer." Id.[26] In summary, the Bureau argues that it has the power under the tied house provision of the Act to punish wholesalers for pricing their products at less than cost unless the price can be specifically justified to the Bureau.[27]
 
 
 13
 National, in contrast, argues that the Bureau has no authority under the Act to regulate competitive pricing. It observes that the "plain language of the statute * * * contains not a word about price competition." Brief for petitioner at 14. National asserts that because the practice in this case was merely a pricing arrangement it is insulated from challenge by the Bureau under the Act.
 
 
 14
 Our examination of the language and structure of the Act provides considerable support for National's interpretation. There is not a hint in the statute that nondiscriminatory price cutting, destructive or otherwise, is prohibited. The primary purpose of the "Exclusive outlet," "Tied house," and "Commercial bribery" subsections of Section 5 seems to be prevention of a form of vertical integration whereby wholesalers or producers might gain effective control of ostensibly independent retail outlets. In the absence of any indication that National's price cut had the purpose or effect of gaining control over retail outlets in Leon County,[28] we doubt whether the Act can have any application.
 
 
 15
 We acknowledge that, taken by itself, the phrase "giving * * * or selling * * * other thing of value" is broad enough to include below-cost sales. But ordinary sales at or above cost must also be considered "giving * * * or selling * * * other thing of value": clearly an absurd result since, so construed, the Act would prohibit sales of alcoholic beverages altogether. Applying ordinary principles of statutory construction,[29] we must read the phrase "other thing of value" in the light of the many specific enumerated examples in the text. Financing the license, property, or other capital assets of the retailer, or furnishing equipment, fixtures, signs, supplies, or advertising used by the retailer all involve a link or tie between the wholesaler or producer and the retailer. In contrast, a nondiscriminatory, unconditional low-priced sale such as in this case is a single, contained transaction; it involves no link or tie between the parties, and it has no effect on any other transactions.
 
 
 16
 The Bureau argues that pricing arrangements are not necessarily insulated from scrutiny under the Act, and we agree. In some circumstances a pricing arrangement might be used as a "subterfuge"[30] to disguise a grant of financial assistance given to create a tied house, or to obtain an exclusive sales agreement. However, the statute itself provides no convincing support for the Bureau's claim of authority to prohibit below-cost pricing. The Bureau urges us to give the statute a broad construction, citing the statement in Black v. Magnolia Liquor Co., 355 U.S. 24, 26, 78 S.Ct. 106, 109, 2 L.Ed.2d 5 (1957), that "(t)he will of Congress would be thwarted if we gave the language in question the strictest construction possible." We have therefore examined the legislative history with great care to determine whether the will of Congress would be thwarted by our straightforward construction of the Act. Contrary to the Bureau's assertions, our construction finds decisive support in the legislative history, and also in the prior administrative and judicial interpretations of the Act.
 
 III. LEGISLATIVE HISTORY
 
 17
 The Federal Alcohol Administration Act, 27 U.S.C. §§ 201-212, 49 Stat. 977, was passed by both houses of Congress on August 24, 1935 and signed into law five days later, Pub.L. No. 74-401, 74th Cong., 1st Sess. (1935). Its extensive legislative history must be understood in the context of the times: it was passed to fill a regulatory gap created by the repeal of prohibition and the decision of the Supreme Court striking down the National Industrial Recovery Act as unconstitutional.[31] According to the House Report accompanying the Federal Alcohol Control bill, the Twenty-first Amendment repealing prohibition was adopted with "unexpected speed." H.R.Rep. No. 1542, 74th Cong., 1st Sess. 3 (1935) (hereinafter cited as House Report); accord, S.Rep. No. 1215, 74th Cong., 1st Sess. 2 (1935) (hereinafter cited as Senate Report). Repeal became effective on December 5, 1933, at a time when no legislation was on the books to regulate the alcoholic beverage industry. Id. Congress was not in session, so President Roosevelt employed his powers under Title I of the National Industrial Recovery Act (NIRA), Pub.L. No. 73-67, 48 Stat. 195 (1933), to establish a Federal Alcohol Control Administration with power to enforce NIRA Codes of Fair Competition for the alcoholic beverage industry. Executive Order No. 6474 (December 4, 1933). Six such Codes of Fair Competition were promulgated for the relevant industries: brewers, distillers, rectifiers, importers, wholesalers, and wine producers.[32] Although the President originally adopted the NIRA Codes to serve as a temporary expedient until Congress could pass legislation to regulate the alcoholic beverage industry,[33] the code system continued in effect until May 27, 1935, when the Supreme Court struck down the NIRA in A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). Congress thereafter acted quickly, lest the alcoholic beverage industry escape the supervision of the federal government altogether.
 
 
 18
 In the early days after repeal of prohibition the nation was infested with bootleggers and racketeers anxious to continue their trade and willing to thwart the tax and health laws. The Seventy-fourth Congress, therefore, apprehended that abuses in the liquor industry were quite likely to occur. The Act represents a congressional determination to use unusually strong measures to combat this unusually dangerous menace. The House Report stated that "(m) any factors not common to other industries" especially the presence of racketeers and the temptation to evade the tax laws by operating outside of legitimate channels caused "wide-spread violations and evasions" of the liquor laws. House Report, supra, at 5, 6. "Relatively drastic enforcement methods, such as the permit system, therefore become necessary," the Report concluded. Id. at 6. Although the practices prohibited by the Act were in some ways "analogous to those prohibited by the antitrust laws," id. at 12, the House Report emphasized that conditions in the liquor industry were such that "Federal trade" laws were "insufficient" to accomplish the objective. Id. at 3.
 
 
 19
 In particular, Congress concluded that there was a close connection between economic abuses and "certain incidental social evils" connected with the alcoholic beverage industry. Id. at 12.[34] The continued preva lence of bootlegging and related corruption was a recurring theme in the hearings, reports, and debates on the Act. Members of Congress and witnesses before congressional committees estimated that over half of the liquor consumed in the United States was illicit. See 79 Cong.Rec. 12943 (1935) (statement of Senator Copeland).[35] Illegal traffic in liquor not only decreased federal revenues, but was also seen to threaten the health and morals of the citizens. The overriding purpose of the Act was to combat these abuses. See House Report, supra, at 1.
 
 
 20
 We shall consider in detail only those aspects of the Act and legislative history relating to competitive practices in the industry. In particular, we shall examine the general problem of the "Whisky Trust" perceived by Members of Congress, and how that problem related to the more specific competitive abuse called the "tied house." Then we will compare the Act with the prior Code of Fair Competition for further evidence of congressional intent with regard to price regulation.
 
 A. The Whisky Trust
 
 21
 Most Members of Congress considered the structure of the legitimate alcoholic beverage industry in the years immediately following repeal of prohibition to be highly uncompetitive. During prohibition a small number of distillers had obtained permits for the manufacture of whisky for medicinal purposes, and consequently held a significant competitive edge after repeal.[36] Moreover, certain distillers had purchased trade names and supplies of old whisky during prohibition for eventual use in case of repeal.[37] Since most good whisky must be aged for several years typically four or more before it is drunk, and because aged whisky is needed for blending some cheaper whiskies, these few farsighted firms temporarily exercised a large degree of control over the industry. The situation was exacerbated by the initial decision of the Federal Alcohol Control Administration (established pursuant to the NIRA) to restrict distilling permits to those who had distilleries already in or near operation when the Code of Fair Competition went into effect.[38] Later these restrictions were relaxed, enabling competition in the industry to increase.[39]
 
 
 22
 In 1934 the nine largest distillers produced almost 81 percent of the nation's whiskey.[40] The largest distiller, National Distilling Company, produced almost 23 percent.[41] By early 1935 the concentration figures for the industry already showed "a considerable modification," according to the Chairman of the Federal Alcohol Control Administration.[42] National Distillers' share of the market fell to 15.9 percent in the first four months of 1935, and the number of distilling plants in operation doubled during 1934.[43] Nevertheless, though concentration was declining, it remained disturbingly high in the summer of 1935 when the Act was debated and passed.
 
 
 23
 Many Members of Congress opined that there was a "Whisky Trust" dominating the industry. Congressman Fuller, for example, said that "at the present time there is a Whisky Trust in the United States that is not rivaled by even the whisky ring of Grant's administration during the Civil War period." 79 Cong.Rec. 11719. Some of them also believed that there was a "Bottle Trust" linked to the Whisky Trust, see id. at 12934 (statements of Senators Clark and McKellar), and that the trusts in tandem had driven the price of legitimate whisky to unreasonably high levels. Members of Congress reported that four-year-old whisky that cost distillers about $1 per gallon to produce and store was selling for $12 to $24 per gallon wholesale.[44]
 
 
 24
 In this market of inflated prices compounded by a federal tax of $2 per gallon on legitimate whisky the bootleggers were able to maintain their position in the industry. As Senator Copeland explained, the American liquor problem comprised "just two elements":
 
 
 25
 First. Bootlegging and illicit selling continue to absorb at least 50 percent of the present consumption of spirituous liquors. * * *
 
 
 26
 Second. Retail tax-paid prices are high, which is an additional encouragement to illicit selling.
 
 
 27
 A means can be found to put out of business organized bootlegging mobs and, if so, illicit selling can be practically eliminated. The same means will make it possible to reduce prices to the consumer by from 25 to 40 percent. * * *
 
 
 28
 79 Cong.Rec. 12943. This view was widely shared, and only once contradicted.[45] Senator George, for example, commented that
 
 
 29
 so long as the inducement is there we will have violations of the whisky laws. In other words, so long as the price is sufficiently high, somebody is going to make illegal whisky and is going to sell it * * *.
 
 Id. at 12938. Senator Clark stated:
 
 30
 These nine companies, constituting the Whisky Trust, * * * contributed very much to the prevalence of bootlegging by keeping the price so high and selling such poor liquor that the bootlegger still had an opportunity to exist.
 
 Id. at 12933.[46]
 
 31
 While the Members of Congress essentially agreed on the cause of the bootlegging problem, they did not agree on the solution. In addition to adoption of the Act, Members suggested various other reforms: that rulemaking authority be denied to the new Bureau, so that it could not collude with members of the Whisky and Bottle Trusts to restrict entry or prop up prices, id. at 11720 (Congressman Fuller); that liquor taxes be decreased, id. at 12933 (Senator Clark), id. at 12938-12939 (Senator George); that the tariffs and quotas on foreign alcoholic beverages be reduced, id. at 11735 (Congressman Duncan), id. at 12933 (Senator Clark); that taxes be collected at sale rather than at production to prevent "pyramiding," id. at 12943-12947 (Senator Copeland); and that interlocking directorates be more strictly regulated, id. at 12934 (Senators Clark and McKellar). The most controversial provision of the bill was its restriction on bulk sales to retailers, Section 6, 27 U.S.C. § 206. During the lengthy debate on this provision, see especially 79 Cong.Rec. 11733-11738 (House of Representatives), and 12932-12941 (Senate), supporters of the provision argued that it would facilitate enforcement of the laws while opponents argued that it would increase the cost of legitimate liquor and therefore increase the incentive for bootlegging. Despite disagreement over particular nostrums, however, in both Houses of Congress there appeared to be total unanimity on the conclusion that lower prices were desirable. Certainly there was no suggestion that price cutting is abusive or should be controlled.
 
 
 32
 B. The "Tied House"
 
 
 33
 In contrast to the general debates over the Act, and especially over the abuses of the Whisky Trust, the discussions of the "tied house evil" included no mention of prices, whether high or low. The Members of Congress debating the bill repeatedly stated that the tied house provision was designed to prevent control by alcoholic beverage producers and wholesalers over retail outlets,[47] especially saloons.[48] As Congressman Treadway, minority spokesman for the bill, explained:
 
 
 34
 Probably some of the Members wondered what the meaning may be of "tied house", the first two words under (b). To my mind that is one of the best features in this bill if it accomplishes what it is intended to accomplish. Subsection (b) is intended to prevent distillers, brewers, and wholesalers controlling the dispensation of whisky or beer, as the case may be, by exercising dominion and control over the place at which the liquor is sold.
 
 
 35
 Id. at 11717. He added that the tied house was "one of the great reasons that brought on prohibition." Id. The Senate Report accompanying the Act stated:
 
 
 36
 The first class of these prohibited practices were those which tended to produce monopolistic control of retail outlets, such as arrangements for exclusive outlets, creation of tied houses, commercial bribery, and sales on consignment or with the privilege of return. * * * (C)ontrol by producers and wholesalers of retail outlets through the various devices such as those prohibited by the bill has been productive not only of monopoly but also of serious social and political evils which were in large measure responsible for bringing on prohibition. * * *
 
 
 37
 Senate Report, supra, at 6-7. Producers or wholesalers were said to provide financial and advertising assistance to retailers, on the "condition" that, or upon "agreement" that, the retailer would serve as an exclusive outlet. 79 Cong.Rec. 11795, 11796 (Congressman O'Malley). Thus the essence of the "tied house evil" was vertical integration. According to the Senate Report, "The tied-house provisions * * * relate to the acquisition by industry members of control over theretofore independent retail establishments * * *." Id. at 7.
 
 
 38
 All manner of social evil was linked to the tied house. Some considered the tied house a source of political corruption. See Senate Report, supra, at 7. This theory was best explained by Joseph Choate, Chairman of the Federal Alcohol Administration:
 
 
 39
 Before prohibition, a vast number of the retail outlets of the country where liquor was sold for consumption on the premises had fallen into the hands of the distillers and the brewers. The larger distillers and brewers controlled scores, hundreds, and possibly thousands of such outlets. That inevitably threw them into politics, inevitably led them to seek control of State and municipal legislation, and brought about an unhealthy political condition which, in my judgment, was one of the first causes of prohibition. * * *
 
 
 40
 Federal Alcohol Control Act: Hearings on H.R. 8539 Before the House Committee on Ways and Means, 74th Cong., 1st Sess. 10 (1935).
 
 
 41
 Some Members of Congress suggested that the tied house caused a proliferation of saloons and bars. When informed that the Senate had exempted brewers from the tied house provisions of the Act, Congressman McFarlane predicted that this would "tend to put an open saloon on every street corner," 79 Cong.Rec. 14569, to which Congressman Fuller added in agreement, "It will have a tendency toward the days before prohibition." Id. In hearings before the Senate a representative of the brewing industry requested that his industry be exempted from the tied house provisions of the Act. Senator Barkley asked him, "Do you claim then, it was a good thing for a lot of brewers and distillers to multiply the number of saloons in the town because they had furnished the money, paid the rent?" Federal Alcohol Control Act: Hearings on H.R. 8870 Before the Senate Committee on Finance, 74th Cong., 1st Sess. 119 (1935) (hereinafter cited as Senate Hearings). A moment later he rephrased his question: "(D)o you think it is wise to permit an unlimited number of retail dealers to go into business just because some wholesalers will put up money?" Id.
 
 
 42
 Many Members of Congress apparently thought the tied house tended to increase consumption of alcohol. The House Report accompanying the bill denounced the "forced increase in alcoholic beverage sales resulting from the 'tied-house.' " House Report, supra, at 12. See also Senate Hearings, supra, at 119, 122 (remarks of Senator Connally and Mr. Donnelly, representative of the brewing industry). Congressman Lewis of Colorado explained one reason for believing this:
 
 
 43
 Before prohibition, in our part of the country at least, one of the evils of the liquor traffic was that a retailer was required by the brewer or distiller to take a certain quota of beer or spirits of some private brand as a condition to being allowed to retail that brand. The temptation was often irresistible for the retailer to induce customers to buy drinks when they had already had quite enough. * * *
 
 
 44
 79 Cong.Rec. 11797.
 
 
 45
 Some Members of Congress expressed the view that the tied house produced irresponsible ownership of retail outlets. In the words of Senator Connally:
 
 
 46
 Is not it true that in the old days a lot of the opposition to liquor and beer arose because of the fact that the brewers would put in a sort of a sorry fellow who had no responsibility and no money to buy his equipment, and they would pay for his license and put him in his business, and he was usually the fellow who violated all the Sunday laws and every other kind of law? That is why the thing grew up. This evidently is based on that theory, that a man ought to have some personal responsibility to run a grog shop, not depending on the brewer financing him.
 
 Senate Hearings, supra, at 119.[49]
 
 47
 These "tied house evils" political corruption, proliferation of saloons, increase in alcohol consumption, and irresponsible ownership of retail outlets were unrelated to price competition. They were not promoted, in the view of Congress, by destructive price cutting, but instead by the purchase of control or exclusive selling rights from ostensibly independent retailers in need of financial assistance.
 
 C. The Codes of Fair Competition
 
 48
 The Code of Fair Competition for the Alcoholic Beverage Wholesale Industry, Code Series A, Revision No. 2 (as amended, April 19, 1935) (hereinafter cited as Code), was similar in many respects to the later Federal Alcohol Administration Act. It included, for example, a permit system and proscriptions of false advertising, misbranding, commercial bribery, consignment sales, and exclusive outlets. Id., Arts. IV-VI. It also prohibited "Control of Retail Outlets," id., Art. V, § 8, a category of conduct essentially identical to the tied house.[50] In fact, the Act is in large part modeled after the earlier Code. The House Report stated: "The bill embodies in statutory form so much of the former code system as the committee now deems appropriate and within the constitutional power of Congress to enact. In general, it may be said that the bill incorporates the greater part of the system of Federal control which was enforced by the Government under the codes." House Report, supra, at 4; accord Senate Report, supra, at 3.
 
 
 49
 In one important respect, however, the Code was quite different from the later Act. In Articles VIII and IX the Code regulated "Prices and Terms of Sale" in the industry. The Code required posting of prices and prohibited use of any price or term of sale which "(a) will constitute destructive price cutting, or (b) be so high as to encourage, directly or indirectly, the sale of alcoholic beverages * * * in violation of law, or (c) be oppressive to the consumer." Code, supra, Art. VIII, § 4 (distilled spirits and wine); see also id., Art. IX, § 4 (products of breweries). It also prohibited producers and wholesalers from granting allowances or guarantees against the event of price declines. Id., Art. V, § 6 (distilled spirits or wine); id., Art. VI, § 7 (products of breweries). The Code thus provided the Federal Alcohol Control Administration with precisely the authority asserted by the Bureau in this case: the power to prevent "destructive" or below-cost pricing.
 
 
 50
 Since the Code contained provisions prohibiting both tied houses and destructive price cutting, it is unlikely that the Code's provision making it illegal "(t)o furnish, give, or lend * * * other thing of value," id., Art. VI, § 6, was intended to reach destructive price cutting. Such an interpretation would render id., Art. IX, § 4 (prohibition of destructive price cutting), superfluous. Since Congress consciously used the same language ("furnishing, giving, renting, lending, or selling * * * other thing of value," Section 5(b)(3)), we must give that language the same construction. Section 5(b)(3) cannot, therefore, be interpreted to prohibit destructive price cutting.
 
 
 51
 This conclusion is buttressed by the fact that Congress knowingly deleted all authority over pricing from the Act. The House Report, after explaining that the Code served generally as the basis for the new Act, stated: "The outstanding exceptions are that all provisions relating to open-price competition, including posting of prices and prohibition of guarantees against decline in price and of refunds, rebates, and concessions, have been omitted (.)" House Report, supra, at 4 (emphasis added); accord, Senate Report, supra, at 3.[51] When introducing the legislation to the House, Representative Cullen stated:
 
 
 52
 The bill does not reenact the liquor industry codes. Such provisions as price fixing, hours and wages regulations, and similar code provisions are not contained in the bill. The bill incorporates only those trade-practice provisions that the committee found were within Congress' power to enact, were feasible administratively, and necessary for the fair conduct of business.
 
 
 53
 79 Cong.Rec. 11714. As we have already noted, most Members of Congress hoped that the Act would drive prices of alcoholic beverages down and thereby undercut the market position of the bootleggers.[52] It would therefore have been inconsistent for them to prohibit price cutting. In the House hearings concerning extension of the NIRA Congressman Duncan questioned Chairman Joseph Choate of the Federal Alcohol Control Administration on the effect of the Code on competitive price cutting:
 
 
 54
 In your statement * * * one of the things prohibited apparently by the code * * * is guaranties against price decline. It seems to me that one of the most universal complaints that we hear with respect to the liquor interests or business today is the apparent unreasonable price of liquor, which is contributing more to the continuation of the illicit liquor business than any other one thing. Is there something in the code that prevents the reduction in the price of liquor?
 
 
 55
 Extension of National Industrial Recovery Act: Hearings Before the House Committee on Ways and Means, 74th Cong., 1st Sess. 285 (1935). Subsequently, H.R. 8535 and H.R. 8870, 74th Cong., 1st Sess. (1935) which eventually were enacted with minor amendments as the Federal Alcohol Administration Act[53] were proposed, perpetuating most of the regulatory functions of the Federal Alcohol Control Administration, but deleting the guarantees against price decline and destructive pricing that existed under the Code.
 
 D. Conclusions from the Legislative History
 
 56
 In summary, four propositions emerge clearly from the legislative history of the Act. First, the "tied house" provision of Section 5 was designed to prevent producers and wholesalers from imposing exclusive contracts or exclusive agencies upon formerly independent retailers. Second, the phrase "giving * * * other thing of value" originally appeared in the Code of Fair Competition, where it could not have been interpreted to prohibit "destructive" price cutting. Third, prices in the liquor industry were thought to be unreasonably high, and Congress evinced no desire to impede price cutting. Fourth, the power of the Federal Alcohol Control Administration to prop up or stabilize prices was deliberately eliminated. It makes little sense, therefore, to interpret the "tied house" provision of the Act as a grant of authority to the Bureau to prevent nondiscriminatory below-cost pricing.
 
 IV. ADMINISTRATIVE INTERPRETATION
 
 57
 The Bureau asserts in its brief, "The Bureau has always interpreted Section 5 of the Act as precluding sales below 'laid-in' cost under circumstances such as those present in this case." Brief for respondent at 13. When we examine the past rulings of the Bureau,[54] however, we see a very different picture: the Bureau's present policy is an abrupt and unexplained shift from the position it followed from at least 1949 until 1974.
 
 
 58
 Revenue Ruling 54-161, 1954-1 C.B. 338, is acknowledged to be "the focal point of the modern day pricing doctrine(.)" App. 69 (Order of the Acting Director). It provides:
 
 
 59
 Price reductions, rebates, refunds, and discounts given by a wholesale liquor dealer to a retail liquor dealer pursuant to an agreement made at the time of the sale of the merchandise involved are considered a part of the sales transaction, constituting reductions in price pursuant to the terms of the sale. Such transactions do not fall within the purview of section 5(b) of the Federal Alcohol Administration Act provided they do not involve the imposition of any requirement upon the retailer to take and dispose of a certain quota of the wholesale dealer's products, or do not involve any of the other practices set forth in section 5(a) to 5(d), inclusive, of the Act. * * *
 
 
 60
 Rev.Rul. 54-161, 1954-1 C.B. 338. The Ruling goes on to state that a violation of Section 5 might occur when "the pricing aspect is merely a subterfuge." Id. It gives no definition of "subterfuge" and no examples of what might be considered such a "subterfuge." For this, we turn to Advisory Memorandum No. 307 (June 14, 1949), reprinted in appendix to petitioner's brief at 11.[55] The Bureau has stated that the Ruling and the Memorandum have a "similar logic," App. 69; indeed, the Ruling may be understood as a more formal summary of the informal but detailed Memorandum.
 
 
 61
 Advisory Memorandum No. 307 could hardly be more clear: "(T)he Act does not prohibit the brewer or permittee from selling to whomsoever he chooses * * * and at whatever price the buyer is willing to pay * * * (with or without price reductions, refunds, rebates or discounts), even though the obvious purpose of the seller in offering low prices is to induce purchases." Id. at 12. The Memorandum acknowledged, however, that reductions in price might sometimes be used as consideration for agreements or arrangements that violate the Act. If a low price transaction
 
 
 62
 also includes a requirement that in order to take advantage of the price reduction the retailer must purchase exclusively from the seller, Section 5(a) of the Act would be applicable, not because of the price or any inducement naturally resulting from the price but by reason of the requirement upon which it is conditioned. In short, though price reductions, rebates, refunds and discounts are not in themselves prohibited even though they do result both in "inducement" of the retailer and "exclusion" of competitors' products, if they are coupled with or in any way conditioned upon any of the "tieing" practices specifically covered by the Act, such practice determines the applicability of the Act and is the basis of the violation, if any, thereunder.
 
 
 63
 Id. The Memorandum supplied other examples of price reductions violative of the Act: those conditioned upon disposal of a certain quota of liquor, or upon application of the savings to the purchase of fixtures and equipment, to the defraying of the costs of licenses or improvements, or to the payment of interest or principal on loans. In each instance the transaction would violate Section 5 of the Act, not because of the price reduction, but because of the "tieing" condition. Id. The Memorandum concluded that:
 
 
 64
 (I)n order to determine whether a transaction involving pricing is in violation of the Act, it is necessary to disregard the pricing aspects and look further to determine whether the transaction also involves expressed or implied agreements or understandings prohibited by Section 5(a), (b), (c) or (d) * * *.
 
 Id. at 13.[56]
 
 65
 The Bureau's formal position in 1954, therefore, was that price cuts and discounts are permissible under the Act unless they constitute a "subterfuge" whereby impermissible agreements or understandings are disguised as bona fide pricing arrangements.
 
 
 66
 So the matter stood until 1974. In ATF Rul. 74-6, 1974 ATF C.B. 50, which it described as an "amplification" of Rev.Rul. 54-161, the Bureau revealed a subtle but decisive shift in policy:
 
 
 67
 (T)he Bureau takes cognizance of the fact that discounts may be granted to introduce new products, promote slow moving items, pass on to retailers savings to the supplier as a result of volume purchase, etc., and as such are methods used to arrive at an agreed sales price. However, if the discount is such that it is in reality a subterfuge for granting financial assistance to a retailer or for any other proscribed purpose the discount would constitute a "gift" within the meaning of 27 U.S.C. 205(b)(3).
 
 
 68
 In considering whether a discount is in fact a method for arriving at an agreed sales price and not a subterfuge, the Bureau holds there must be a reasonable relationship between the discount and purpose for which it is granted * * *. ([57]
 
 
 69
 Two years later, in ATF Rul. 76-16, 1976-8 ATF C.B. 11, the Bureau announced that it would "now consider questionable, and subject to investigation," any transactions where the price to the retailer is less than the wholesaler's "laid-in" cost. Id. "If an investigation discloses that the discount, price reduction, etc., is in fact a subterfuge for granting financial assistance to a retailer the Bureau will consider the transaction a proscribed inducement," the Ruling announced. Id.
 
 
 70
 Although the Bureau denies that its interpretation of Section 5 has changed, see ATF Rul. 76-16, supra ; Order of the Acting Director, App. 64-72; brief for respondent at 13, it has in fact turned about-face. In its early pronouncements the Bureau stated a general rule that price reductions are permissible under the Act, with an exception that such reductions might violate the Act where it can be proven that they are part of an understanding or agreement tieing the retailer to the wholesaler. Under the current interpretation the Bureau views the "pricing doctrine" as "an exception to the general prohibition against giving or furnishing things of value(.)" App. 72. Now, the Bureau presumes price reductions below cost impermissible, apparently placing the burden of proof on the wholesaler to establish that the price cut is for the purpose of promoting slow-moving items, passing on volume savings, or closing out a product line. A price reduction thus may be taken to violate the Act without any evidence whatever of an agreement or understanding tieing the retailer to the wholesaler.
 
 
 71
 This recent shift in Bureau policy is completely unexplained by any Bureau decision. Indeed, the Bureau has claimed that no shift in policy has occurred. This posture has precluded the possibility of a reasoned analysis of the factors for or against such a change, or of the statutory authority for making such a change.[58] The administrative interpretation of the Act until the late and unexplained departure thus supports our and National's construction of the statute and interpretation of the legislative history.
 
 V. JUDICIAL INTERPRETATION
 
 72
 The courts have rarely been called upon to delimit the scope of Section 5(b) of the Act, and we find no precedent that controls this case. However, with the exception of a recent District Court decision,[59] the reported opinions on the subject are more consistent with National's interpretation than that of the Bureau. In the exception, Castlewood International Corp. v. Simon, 404 F.Supp. 88 (S.D.Fla.1975), rev'd on other grounds, 596 F.2d 638 (5th Cir. 1979), cert. granted, --- U.S. ----, 100 S.Ct. 2914, 64 L.Ed.2d 806 (1980), the court held that ATF Ruling 74-6, supra, embodying the Bureau's current view of below-cost pricing, was within the scope of the Bureau's jurisdiction and statutory authority. 404 F.Supp. at 92-93. This case is the only reported decision we have found that is directly relevant to the present appeal, and we give its interpretation appropriate weight. It does not persuade us, however, for it fails to discuss either statutory language or legislative history.[60] We turn, therefore, to other federal decisions generally interpreting the tied house provision of the Act.
 
 
 73
 The paradigm case of a tied house violation is found in Levers v. Anderson, 153 F.2d 1008 (10th Cir.), cert. denied, 328 U.S. 866, 66 S.Ct. 1376, 90 L.Ed. 1636 (1946). A partnership named Levers Brothers, a liquor wholesaler, was found to violate Section 5(a) and (b) of the Act. The partnership "so dominated and controlled a substantial number of retail dealers, that the latter were compelled to purchase substantially all of their requirements from Levers Brothers(.)" Id. at 1009. In addition, the partnership "guaranteed other indebtedness of retail dealers; * * * paid for and obtained licenses for retail dealers; and * * * owned interest in real estate used by retail dealers in conducting their business." Id. The partnership obviously violated the Act. In two other cases tie-in sales, wherein a wholesaler or producer sells a scarce product to a retailer on the condition that the retailer also buy a specified quantity of other products, were held to violate the "quota sales" portion of the tied house provision, Section 5(b)(7), 27 U.S.C. § 205(b)(7). Black v. Magnolia Liquor Co., supra, 355 U.S. 24, 78 S.Ct. 106, 2 L.Ed.2d 5; Distilled Brands, Inc. v. Dunigan, 222 F.2d 867 (2d Cir. 1955).
 
 
 74
 These are the only relevant instances we have found in which federal courts have held transactions to violate the tied house provision of the Act. Although nothing in the opinions directly contradicts the position taken by the Bureau in this case, the factual situations of the cases are quite different from that in the case at bar. In both Levers and Magnolia Liquor furnishing of money or supplies was coupled with an agreement or understanding to buy other goods from the wholesaler. In the former case the retailers agreed to buy substantially all of their requirements from the wholesaler; in the latter they agreed to buy a specified quantity of products from the wholesaler. In the case at bar, however, the alleged "gift" of money in the form of a price cut was not coupled with an agreement or understanding of any kind. There is no suggestion in the record that sales other than the immediate transaction itself were affected.
 
 
 75
 We have found no reported federal decisions explicitly excluding price discounts from the coverage of the tied house provision, but two Court of Appeals decisions strongly suggest such an interpretation. In Brown-Forman Distillers Corp. v. U.S. Treasury Dep't, Bur. of A., T. & F., 591 F.2d 375 (6th Cir. 1979), the court analyzed several aspects of a promotional campaign waged by Brown-Forman to see whether the company had violated Section 5. Two of the promotional gimmicks discussed by the court were a "sales contest" with prizes valued at approximately $600, and a price discount of $8 per case, or 17 percent, on a certain brand of Canadian whisky. The court found that the sales contest was a technical, nonwillful violation of Section 5(c) (commercial bribery). But it said that the legality of the price discount was not questioned, noting that "(i)t was offered to all customers during this period." Id. at 376 n.2. This explanation implies that the court believed a price discount cannot violate the Act so long as it is offered generally to all customers within a time period. In American Distilling Co. v. Wisconsin Liquor Co., 104 F.2d 582 (7th Cir. 1939), the court analyzed certain sales tactics of a producer, including its giving a "free" case of goods for every ten cases purchased by trade buyers. This was, of course, the equivalent of a 10 percent discount. The court explicitly considered only the applicability of Section 5(c) (commercial bribery), but its comments might apply equally well to Section 5(b):But we do not think that the conduct of plaintiff comes within the foregoing definition. The gift of the case of goods was made directly to the employer and is in substance a trade discount. * * *
 
 
 76
 Id. at 585. Apparently, the court considered the grant of "trade discounts" legitimate under the Act.[61]
 
 
 77
 We also note that in Trenton Beverage Co. v. Berkshire, 151 F.2d 227 (3d Cir. 1945), the court held that wholesale pricing above the level permitted under wartime restrictions did not violate the Act,[62] because the Act has no relation to pricing decisions. Even the dissenter admitted: "There is no doubt that the act itself was not intended to and does not regulate or relate to the prices at which alcoholic beverages are to be sold." Id. at 230 (Maris, J., dissenting). He argued, instead, that the provisions of the Emergency Price Control Act of 1942, Pub.L.No. 77-421, 56 Stat. 23, could be enforced through the procedures of the Federal Alcohol Administration Act.
 
 
 78
 Although these judicial interpretations of the Act do not explicitly address the issue we are faced with here, we believe they are consistent with our reading of the language, legislative history, and early administrative interpretation of the Act. Each of these sources independently supports the view that competitive pricing even below cost is permitted under the Act, so long as it is not connected with an agreement or understanding to purchase products from one wholesaler to the exclusion of others. The Bureau has made but weak responses to this evidence concerning the meaning of the Act. We turn, therefore, to the Bureau's principal remaining argument, based on the "remedial purpose of the Act." Brief for respondent at 13.
 
 
 79
 VI. ENFORCEMENT OF THE ROBINSON-PATMAN ACT THROUGH SECTION 5
 
 
 80
 The Bureau's theory, expounded in the Order of the Acting Director, App. 75-76, is based on the statement in the House Report, supra, at 12, that the unfair practices described in Section 5 of the Act were "analogous to those prohibited by the antitrust laws." Since the Robinson-Patman Act, 15 U.S.C. § 13a (1976) an antitrust law has been interpreted to outlaw unjustified below-cost pricing,[63] the Bureau reasons that Section 5 must also outlaw unjustified below-cost pricing. The Bureau states that "it would frustrate the remedial purpose of the Act if a wholesaler could by charging any sum no matter how small for goods sold to a retailer call a transaction a pricing arrangement and claim, therefore, that he could not violate the Act. Congress clearly intended no such result." Brief for respondent at 13.
 
 
 81
 Even on the surface the Bureau's analysis has an obvious flaw. The Bureau concluded that the "specific objectives of Congress in its enactment of section 205 * * * (were) to prohibit the same 'unfair practices' in the liquor industry as had already been prohibited by the antitrust laws." App. 76 (emphasis added). But at the time the Act was passed no antitrust law prohibited below-cost pricing. The Robinson-Patman Act was not passed until June 19, 1936, and could not, therefore, be one of the "antitrust laws" to which Section 5 of the Act was described as "analogous."[64]
 
 
 82
 More fundamentally, we hesitate to hold that one statutory scheme, with its own provisions for procedures and penalties, can be enforced under a different statutory scheme, without direct authorization by Congress. Cf. Great American Fed. S. & L. Ass'n v. Novotny, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979) (provisions of Title VII of the Civil Rights Act of 1964 not enforceable through the procedures of 42 U.S.C. § 1985(c)). The Robinson-Patman Act is a criminal statute, imposing fines and imprisonment on violators through court proceedings. The Federal Alcohol Administration Act, in contrast, is regulatory: the operating permits of violators may be revoked, suspended, or annulled through administrative proceedings. Each statute "stands on its own footing and carries its own sanctions." See Nashville Milk Co. v. Carnation Co., 355 U.S. 373, 376, 78 S.Ct. 352, 354, 2 L.Ed.2d 340 (1958). In the absence of congressional authorization the Bureau may not attempt to enforce the substantive provisions of the Robinson-Patman Act through the procedures of the Federal Alcohol Administration Act.
 
 
 83
 In Nashville Milk Co. v. Carnation Co., supra, petitioner sought to sue respondent for triple damages arising from an alleged violation of the Robinson-Patman Act. The triple damage remedy is that provided by Section 4 of the Clayton Act, as amended, 15 U.S.C. § 15 (1976), which states:
 
 
 84
 Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court * * * and shall recover threefold the damages by him sustained * * * .
 
 
 85
 The Supreme Court held that the Robinson-Patman Act is not one of the "antitrust laws" as defined by Section 1 of the Clayton Act, 15 U.S.C. § 12 (1976), and declared that "it is of no moment here that the Robinson-Patman Act may be colloquially described as an 'antitrust' statute." Nashville Milk Co. v. Carnation Co., supra, 355 U.S. at 376, 78 S.Ct. at 354. The Court's conclusion is equally applicable to the case at bar: "(Section) 3 (of the Robinson-Patman Act) contains only penal sanctions for violation of its provisions; in the absence of a clear expression of congressional intent to the contrary, these sanctions should under familiar principles be considered exclusive, rather than supplemented by civil sanctions of a distinct statute." Id. at 377, 78 S.Ct. at 355.
 
 
 86
 It is important to remember, moreover, that specific statements in the legislative history of the Federal Alcohol Administration Act indicate that the Act is not intended to regulate "open-price competition." House Report, supra, at 4; Senate Report, supra, at 3. When he introduced the bill Representative Cullen stated, "The bill does not reenact the liquor industry codes. Such provisions as price fixing * * * are not contained in the bill." 79 Cong.Rec. 11714. The House Report emphasizes that the Act does not merely replicate the "Federal trade" laws, House Report, supra, at 3, but rather that it was designed to prevent abuses peculiar to the alcoholic beverage industry. Id. To this end it established "drastic enforcement methods, such as the permit system(.)" Id. at 6. There is no evidence that Congress intended other laws of general applicability to be enforced in this "drastic" way.
 
 
 87
 Indeed, Congress specifically conditioned operating permits in the alcoholic beverage industry on compliance with Sections 5 and 6 of the Act, the Twenty-first Amendment and its enforcement legislation, and "all other Federal laws relating to distilled spirits, wine, and malt beverages, including taxes with respect thereto." 27 U.S.C. § 204(d). This shows that Congress intended that certain specifically enumerated laws be enforced through the permit system of the Act; the Robinson-Patman Act is not among them. As the Third Circuit said when holding that the Emergency Price Control Act of 1942 could not be enforced through the permit system of the Act:
 
 
 88
 The two statutes, the Alcohol Act and the Emergency Act, are quite separate and distinct, each from the other. Violators of the Emergency Act should be proceeded against under the sanctions and procedure of that Act, whether such violators are dealers in liquor, groceries or other commodities. * * * The mere fact that (the wholesaler's) activities are controlled by two different statutes affords no adequate reason for the application of cross sanctions.
 
 
 89
 Trenton Beverage Co. v. Berkshire, supra, 151 F.2d at 229.
 
 
 90
 We therefore reject the Bureau's argument that, based on a general comment in the legislative history, it is empowered to enforce the provisions of the Robinson-Patman Act in the guise of a violation of Section 5 of the Act.
 
 
 91
 VII. DEFERENCE TO CURRENT ADMINISTRATIVE INTERPRETATION
 
 The Bureau has stated:
 
 92
 The Bureau's rulings are, of course, to be given great weight in determining what violates Section 5(b)(3). Continental Distilling Corp. v. Humphrey, 95 U.S.App.D.C. 104, 220 F.2d 367 (1954). Unless they are so unreasonable in relation to the valid application of the subject matter of Section 5(b)(3) as to be arbitrary and capricious, the Bureau's rulings respecting "laid-in" cost are enforceable.
 
 
 93
 Brief for respondent at 13 n.10.[65] This is rather an exaggeration of the authority with which the Bureau speaks when it interprets an act of Congress. This court is vested by statute with the authority and responsibility to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706 (1976). We are required to "hold unlawful and set aside agency action, findings, and conclusions found to be * * * not in accordance with law(.)" Id.[66]
 
 
 94
 The Bureau's decision to prohibit unjustified below-cost pricing must be classified as "interpretative" rather than "legislative." Cf. Joseph v. U.S. Civil Service Comm'n, 554 F.2d 1140, 1153 (D.C.Cir.1977) (finding an action of the Civil Service Commission "legislative" in character).[67] The Act does not confer upon the Bureau authority to promulgate "legislative" rules to enforce its provisions, other than the authority to create exceptions to portions of the tied house provision in the interest of public health and certain other listed considerations. 27 U.S.C. § 205(b)(3).[68] In introducing the bill to the House, Representative Cullen said:
 
 
 95
 Further, wherever power is granted by the bill to put into effect a policy contemplated by the bill, discriminating language has been used, so that the bill, if enacted, will not suffer from the infirmity of invalid delegation of legislative power.
 
 
 96
 79 Cong.Rec. 11714. The Bureau has not purported to exercise "legislative" authority in this field. See ATF Ruling 76-16, supra.[69]
 
 
 97
 When an agency decision is "interpretative" it is not binding on the courts in the same sense that "legislative" rulemakings are. Agency interpretations are, of course, "entitled to consideration in determining legislative intent * * * . But * * * courts properly may accord less weight to such guidelines than to administrative regulations which Congress has declared shall have the force of law(.)" General Electric Co. v. Gilbert, 429 U.S. 125, 141, 97 S.Ct. 401, 410-411, 50 L.Ed.2d 343 (1976). The deference with which we must treat the Bureau's interpretation in this case is that described by the Supreme Court in Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944):
 
 
 98
 We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.
 
 
 99
 In the circumstances of this case the Bureau's interpretation has little power to persuade. Not only is it at odds with the language of the statute and with the legislative history, but it is also at odds with the interpretation adopted by the Bureau's predecessor agency at least as early as 1949 and maintained by the Bureau until 1974. Even in 1974 the Bureau apparently engaged in no thorough consideration of the need for a change in interpretation, and provided no persuasive reason to believe that its change of heart accurately reflects the intention of Congress. As the Supreme Court said in a similar situation, "Against the Treasury's prior longstanding and consistent administrative interpretation its more recent ad hoc contention as to how the statute should be construed cannot stand." United States v. Leslie Salt Co., 350 U.S. 383, 396, 76 S.Ct. 416, 424, 100 L.Ed. 441 (1956). We acknowledge the experience and expertise of the Bureau in enforcing the laws in this area, but we cannot enforce its interpretation where application of the Act would be inconsistent with the clear congressional intention not to regulate open-price competition in this fashion. See Espinoza v. Farah Manufacturing Co., 414 U.S. 86, 94-95, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1973).
 
 VIII. CONCLUSION
 
 100
 The Bureau has asserted the authority to suspend the operating permit of any alcoholic beverage wholesaler that sells its products below cost unless it can prove that the price cut is justified by the need to move slow-moving items, to introduce a new item, to pass on cost savings, or to close out a product. This power is asserted as an interpretation of the tied house provisions of the Act, 27 U.S.C. § 205(b). We cannot uphold this interpretation. The Act itself does not purport to control competitive pricing, however destructive. The language cited by the Bureau, outlawing the "giving * * * (of) other thing of value," 27 U.S.C. § 205(b)(3), when read in the context of the statute as a whole, does not prohibit below-cost pricing.
 
 
 101
 Price cuts are prohibited by the Act only when they are coupled with an agreement or understanding that a retailer will buy other products of the wholesaler or producer to the exclusion of competitors, or when they lead to domination and control of a retail outlet by the wholesaler or producer. When a price cut on specific items, however deep, is offered throughout a sales territory without condition or quantity limitation, we do not see how it can be considered in violation of the Act. Our reading of the Act is amply supported by the legislative history, which emphasizes that "open price competition" is not to be regulated, by early administrative interpretations of the Act, and by the weight of judicial authority.
 
 
 102
 The order suspending National's wholesale permit for three days is hereby
 
 
 103
 Reversed.
 
 
 
 *
 Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 294(c) (1976)
 
 
 [1]
 See the stipulation of facts filed by the parties before the Administrative Law Judge (ALJ), Appendix (App.) 16
 
 
 [2]
 An authorized supplier is responsible for sales and distribution in a given territory. It must arrange for shelf position, inspect and rotate goods, and replace unmerchantable items. See App. 128-129 (testimony of Robert Schehr)
 
 
 [3]
 When a dealer sells outside of its authorized territory, it is called in industry parlance a "bootlegger" or "highjacker." App. 146. This is considered unethical business practice. App. 38 (Initial Decision ). Where the term "bootlegger" appears in the rest of this opinion, however, it is used in the more ordinary sense to mean a seller of illicit alcohol
 
 
 [4]
 The ALJ calculated that National's discount price was at least $7.76 a case less than cost. App. 35. An officer of National estimated the shortfall at about $10 per case. App. 125 (testimony of Mr. Schehr). The precise amount is irrelevant for our purposes
 
 
 [5]
 App. 125
 
 
 [6]
 App. 132
 
 
 [7]
 Stipulations 24-29, App. 19-20
 
 
 [8]
 The number of retailers in the area was estimated by Mr. Schehr, App. 129
 
 
 [9]
 App. 140
 
 
 [10]
 App. 1-6
 
 
 [11]
 App. 10-11
 
 
 [12]
 App. 14-15
 
 
 [13]
 App. 16-20, 83-151
 
 
 [14]
 Initial Decision, App. 21-45. Because of our disposition of this case, we do not reach the issue whether National's conduct was willful
 
 
 [15]
 Order of the Acting Director, App. 56-81
 
 
 [16]
 27 U.S.C. § 203 (1976)
 
 
 [17]
 Id. § 204(d)
 
 
 [18]
 Id. §§ 205(d), (e), & (f), 206, 208
 
 
 [19]
 27 U.S.C. § 205(a) prohibits:
 (a) Exclusive outlet
 To require, by agreement or otherwise, that any retailer engaged in the sale of distilled spirits, wine, or malt beverages, purchase any such product from such person to the exclusion in whole or in part of distilled spirits, wine, or malt beverages sold or offered for sale by other persons in interstate or foreign commerce, if such requirement is made in the course of interstate or foreign commerce, or if such person engages in such practice to such an extent as substantially to restrain or prevent transactions in interstate or foreign commerce in any such products, or if the direct effect of such requirement is to prevent, deter, hinder, or restrict other persons from selling or offering for sale any such products to such retailer in interstate or foreign commerce (.)
 
 
 [20]
 27 U.S.C. § 205(c) prohibits:
 (c) Commercial bribery
 To induce through any of the following means, any trade buyer engaged in the sale of distilled spirits, wine, or malt beverages, to purchase any such products from such person to the exclusion in whole or in part of distilled spirits, wine, or malt beverages sold or offered for sale by other persons in interstate or foreign commerce, if such inducement is made in the course of interstate or foreign commerce, or if such person engages in the practice of using such means, or any of them, to such an extent as substantially to restrain or prevent transactions in interstate or foreign commerce in any such products, or if the direct effect of such inducement is to prevent, deter, hinder, or restrict other persons from selling or offering for sale any such products to such trade buyer in interstate or foreign commerce: (1) By commercial bribery; or (2) by offering or giving any bonus, premium, or compensation to any officer, or employee, or representative of the trade buyer (.)
 
 
 [21]
 27 U.S.C. § 205(b) prohibits:
 (b) "Tied house"
 To induce through any of the following means, any retailer, engaged in the sale of distilled spirits, wine, or malt beverages, to purchase any such products from such person to the exclusion in whole or in part of distilled spirits, wine, or malt beverages sold or offered for sale by other persons in interstate or foreign commerce, if such inducement is made in the course of interstate or foreign commerce, or if such person engages in the practice of using such means, or any of them, to such an extent as substantially to restrain or prevent transactions in interstate or foreign commerce in any such products, or if the direct effect of such inducement is to prevent, deter, hinder, or restrict other persons from selling or offering for sale any such products to such retailer in interstate or foreign commerce: (1) By acquiring or holding (after the expiration of any existing license) any interest in any license with respect to the premises of the retailer; or (2) by acquiring any interest in real or personal property owned, occupied, or used by the retailer in the conduct of his business; or (3) by furnishing, giving, renting, lending, or selling to the retailer, any equipment, fixtures, signs, supplies, money, services, or other thing of value subject to such exceptions as the Secretary of the Treasury shall by regulation prescribe, having due regard for public health, the quantity and value of articles involved, established trade customs not contrary to the public interest and the purposes of this subsection; or (4) by paying or crediting the retailer for any advertising, display, or distribution service; or (5) by guaranteeing any loan or the repayment of any financial obligation of the retailer; or (6) by extending to the retailer credit for a period in excess of the credit period usual and customary to the industry for the particular class of transactions, as ascertained by the Secretary of the Treasury and prescribed by regulations by him; or (7) by requiring the retailer to take and dispose of a certain quota of any such products(.)
 
 
 [22]
 Id. § 204(e)
 
 
 [23]
 "Laid-in cost" is defined as "that cost incurred by a wholesaler or supplier to place the goods in inventory and would consist of such costs as manufacturer's invoice price, freight, and state and local taxes." ATF Rul. 76-16, 1976 ATF C.B. 11, reprinted in appendix to petitioner's brief at 16-17. "Laid-in cost" does not include capital expenses or profit. Terminology in this area is unfortunately inconsistent. In a circular distributed to Florida wholesalers the Bureau forbade pricing below the sum of "laid-in cost" and "total operating cost," App. 153, but the Bureau in its decision consistently referred to "laid-in cost" alone as the benchmark. E.g., App. 51. For the sake of clarity this opinion will use the terms "cost" or "total cost."
 
 
 [24]
 Unfortunately, the Bureau in its decision never concisely stated its legal theory in the case. However, we believe that the statement in text is an accurate summary of the Bureau's approach. The Bureau stated that "(a) discount given below a wholesaler's laid-in cost must be interpreted as the furnishing or giving of something of value to a retailer, since in actuality the distributor has purchased a product at a set price and then sold that product to the retailer at a price less than the price he paid." App. 75. The Bureau also said that sales below laid-in cost "are not automatically violative of the Act," App. 73, but that they are violative if they constitute "unfair competition." Id. It also stated that a sale below laid-in cost is such "unfair competition" if it is without "justification." App. 75. The justifications recognized by the Bureau are "the introduction of new products, the promotion of slow-moving items, and the passing on of costs savings to the retailer." App. 73. Thus in the Bureau's view a sale below cost is a prima facie violation of the Act and a wholesaler must justify any such sale if it is to avoid penalty
 The Bureau's position was explained to the Florida wholesaling industry in a circular reprinted at App. 152-161. This circular included the following statement:
 Section 205(b)(3) proscribes certain means of inducing a re(ta)iler to purchase a wholesaler's product. Selling below "laid-in cost" plus "the cost of doing business" comes within these proscribed means of inducement. If a wholesaler by such proscribed means induces a retailer to purchase that wholesaler's product, i. e., that as a result of such practice a retailer purchases from the wholesaler a quantity of liquor that he otherwise would not have purchased, exclusion would result and a violation of the Federal Alcohol Administration Act would be established.
 App. 154.
 
 
 [25]
 As the Bureau has said, "Each and every sale necessarily excludes a competitive product." App. 154
 
 
 [26]
 We note, however, that in its brief the Bureau seems to suggest instead that the inducement amounts to the difference between the actual price paid and the fair market wholesale value of the product. Brief for respondent at 11 n.8. This would, of course, be a much larger and more subjectively determined amount. If the Bureau were to follow this approach in the future, it would presumably suspend the permits of any wholesalers selling below its estimation of fair market value, subject, of course, to the wholesalers' defenses based on legitimate business purposes. Such an interpretation would be a major extension of the Bureau's authority
 
 
 [27]
 Under the Bureau's interpretation, therefore, it does not matter whether National's price cut was a mistake or an attempt to drive Seminole out of business, except insofar as the latter intent might establish "willfulness." All that matters is that National did not establish one of the Bureau's recognized justifications for the price cut
 
 
 [28]
 There is no suggestion in the record that National's price cutting was related to a scheme of tieing sales, quota sales, exclusive outlets, or the like. The only established effect of the discount was to stimulate National's sales of Lancers wine during the discount period
 
 
 [29]
 See 2A Sutherland's Statutes and Statutory Construction §§ 14.17-14.18 at 103-112 (4th ed. 1973)
 
 
 [30]
 The word "subterfuge" apparently was first used in this connection in Rev.Rul. 54-161, 1954-1 C.B. 338, reprinted in appendix to petitioner's brief at 14
 
 
 [31]
 A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935)
 
 
 [32]
 The Codes were drawn up under the authority of the Secretary of Agriculture and approved by the President in Executive Order No. 6487-A (Dec. 9, 1933). See the preface to the Code in Code of Fair Competition for the Alcoholic Beverage Wholesale Industry, Code Series No. 5, Revision No. 2, at III (as amended, April 19, 1935) (hereinafter cited as Code)
 
 
 [33]
 Id., Art. I, at 1; H.R.Rep. No. 1542, 74th Cong., 1st Sess. 3 (1935) (hereinafter cited as House Report); S.Rep. No. 1215, 74th Cong., 1st Sess. 2 (1935) (hereinafter cited as Senate Report)
 
 
 [34]
 See e. g., 79 Cong.Rec. 11789 (1935) (statement of Congressman Connery): "I think (a proposed amendment) is in the interest of temperance and will keep us from going back to the old saloon during preprohibition days, which practically everyone in this House has said he is absolutely against"; id. at 12937 (statement of Senator Robinson): "(O)ne of the important problems of this period is the suppression of bootlegging, with which are affiliated a thousand other forms of law violation"; id. at 12943 (statement of Senator Copeland): "The public will believe that the difficulties arising out of hurriedly organized national and State methods of control and administration have been corrected; that organized crime which attended the activities of bootleggers, rum runners, and all other illicit purveyors of liquor will hereafter cease to exist"; Federal Alcohol Control Act: Hearings on H.R. 8539 Before the House Committee on Ways and Means, 74th Cong., 1st Sess. 10 (1935) (hereinafter cited as House Hearings) (statement of Joseph H. Choate, Chairman of the Federal Alcohol Control Administration): "The regulations in the proposed bill also take care of a number of those evils * * * which led to prohibition"; id. at 45 (statement of Arthur J. Mellott, Deputy Commissioner, Bureau of Internal Revenue): "This is a bill to protect revenues, the social and economic aspects, and to make, if it is possible to do so, Christians out of those who are in the liquor traffic."
 
 
 [35]
 See also Extension of National Industrial Recovery Act: Hearings Before the House Committee on Ways and Means, 74th Cong., 1st Sess. 301 (1935) (hereinafter cited as NIRA Hearings) (statement of Congressman Jenkins). The House report did not supply statistics on the extent of bootlegging, but it did state:
 The bootlegger and the racketeer have not yet disappeared from our national life. Under existing Federal law there is no means of keeping the criminal from entering the legalized liquor field. * * *
 House Report, supra note 33, at 3.
 
 
 [36]
 See 79 Cong.Rec. 11719 (statement of Congressman Fuller)
 
 
 [37]
 House Hearings, supra note 34, at 27 (testimony of Mr. Choate)
 
 
 [38]
 79 Cong.Rec. 11718, 11720 (statements of Congressman Fuller); id. at 11720 (statement of Congressman Spence); NIRA Hearings, supra note 35, at 302 (testimony of Mr. Choate). Mr. Choate, who was Chairman of the Federal Alcohol Control Administration set up under the NIRA, said that the purpose of restricting permits to those already in the industry was "to keep out the get-rich-quickers." Id
 
 
 [39]
 Id
 
 
 [40]
 NIRA Hearings, supra note 35, at 301 (statement of Mr. Choate), cited in 79 Cong.Rec. 11718-11719 (statement of Congressman Fuller)
 
 
 [41]
 Id
 
 
 [42]
 Federal Alcohol Control Act: Hearings on H.R. 8870 Before the Senate Committee on Finance, 74th Cong., 1st Sess. 9 (1935) (hereinafter cited as Senate Hearings) (statement of Mr. Choate)
 
 
 [43]
 Id. at 9-10, cited in 79 Cong.Rec. 11721-11722 (statement of Congressman Dirksen)
 
 
 [44]
 79 Cong.Rec. 11720 (colloquy between Congressmen Fuller and Dirksen)
 
 
 [45]
 Although he did not deny that the continued prevalence of bootlegging was attributable to the pricing structure of the legitimate industry, Congressman Dirksen of Illinois denied the existence of a Whisky Trust, id. at 11721-11722. He stated that the price of whisky "is not so high," and that it had "progressively decreased." Id. at 11721. In his belief that the alcoholic beverage industry was competitive, Congressman Dirksen drew support from the testimony of the Chairman of the Federal Alcohol Control Administration, see NIRA Hearings, supra note 35, at 310; Senate Hearings, supra note 42, at 9. No other Member of Congress openly defended the competitiveness of the industry
 
 
 [46]
 Congressman Fuller stated: "We cannot drive out the bootlegger who has a pretty good grade of cheap whisky by protecting the highest-price whisky in the world." 79 Cong.Rec. 11720. The House applauded. Id. Senator Clark stated that
 the evidence before the committee and evidence within the general knowledge of the public conclusively demonstrates that the present situation with regard to bootlegging in the United States * * * is due to an unholy combination between a group of distillers in the country practically constituting a trust, and the Bottle Trust. * * * It is my belief that the way to break up bootlegging is to permit the purchase of better liquor at cheaper prices.
 Id. at 12932. Senator Robinson stated that
 the continuance of bootlegging is attributable in large part to the fact that what has been called the "Whisky Trust" has promoted combinations which have fixed the price of legal liquor at such high rates that many consumers of spirituous liquors have preferred to continue the old practice of dealing with bootleggers * * *.
 Id. Accord, NIRA Hearings, supra note 35, at 285 (Congressman Duncan); House Hearings, supra note 34, at 50-51 (Congressman McCormack); id. at 51 (Congressman Doughton, Chairman of the House Ways and Means Committee); Senate Hearings, supra note 42, at 68-69 (testimony of Louise M. Gross, Chairman of the Women's Moderation Union).
 
 
 [47]
 See 79 Cong.Rec. 11796 (Congressman Vinson); id. at 14568 (Congressman Fuller); NIRA Hearings, supra note 35, at 300 (Congressman Jenkins); Senate Hearings, supra note 42, at 65 (Senator Barkley)
 
 
 [48]
 Congressman Fuller stated, "It is common knowledge that in the old days on almost every street corner in the big cities the brewers equipped saloons, and dominated them." 79 Cong.Rec. 14568
 
 
 [49]
 A representative of the wholesale industry also testified in favor of the tied house provision because he thought the existence of tied houses gave producers a competitive advantage over wholesalers. Senate Hearings, supra note 42, at 140 (testimony of A. D. O'Connor)
 
 
 [50]
 Art. V, § 8 of the Code, supra note 32, defined as an "unfair method of competition":
 Control of Retail Outlets. To hold any interest in any license for the sale of alcoholic beverages at retail for consumption on the premises; or, directly or indirectly, to participate or engage in the sale of alcoholic beverages at retail for consumption on the premises; or to control, employ, manage, or financially assist in any manner, any person engaging in the retail sale of alcoholic beverages for consumption on the premises; or to hold for consumption on the premises, unless the holding of such interests is permitted under regulations of the Administration or a statement thereof has been filed with the Administration and has not been disapproved by it; provided that this section shall not be held to prohibit the granting of the credits ordinarily extended by the industry with respect to the sale of alcoholic beverages.
 Id. Art. VI, § 6, applicable to the brewing industry, was essentially to the same effect. See also id., Art. V, §§ 5, 7; id., Art. VI, §§ 5, 9. The Federal Alcohol Control Administration viewed these provisions as a proscription of "tied houses." NIRA Hearings, supra note 35, at 265 (testimony of Mr. Choate).
 
 
 [51]
 The Order of the Acting Director of the Bureau quoted this passage from the House and Senate Reports, but failed to recognize its significance. App. 66-67. The Order said that "it seems clear from the quoted language that the predominant Congressional concern in the pricing area was to eliminate the comprehensive system of Federal price posting that existed under the Codes of Fair Competition," and concluded that "(t)his was not interpreted to mean, however, that wholesalers were to be given a carte blanche authority with respect to rebates and discounts." App. 66. We see no reason to doubt that Congress meant what it said, namely that "all provisions relating to open-price competition * * * have been omitted(.)" House Report, supra note 33, at 4; Senate Report, supra note 33, at 3. The Act does not, of course, give wholesalers carte blanche authority to lower prices; in our system sellers retain such authority unless it is taken away by statute or lawful regulation
 
 
 [52]
 See Part III-A supra
 
 
 [53]
 Hearings were conducted on H.R. 8870, but H.R. 8539 was actually enacted. The bills were identical in all relevant respects
 
 
 [54]
 For purposes of this opinion, we do not distinguish between the Bureau and any of its predecessor agencies. For an explanation of the changes in administrative jurisdiction in this field, see Mid-Valley Distilling Corp. v. DeCarlo, 161 F.2d 485, 486 n.2 (3d Cir. 1947)
 
 
 [55]
 Advisory Memorandum No. 307 (1949), reprinted in appendix to petitioner's brief at 11, was circulated within the Alcohol and Tobacco Tax Division, and not to the public. It was obtained by petitioner pursuant to a Freedom of Information Act request. We would hesitate to treat the Memorandum as precedential authority, but nevertheless use it for the limited purposes of showing the Bureau's prior position on this matter and of clarifying Rev.Rul. 54-161, 1954-1 C.B. 338, which is, for all practical purposes, a summary of the Memorandum. We observe that both the ALJ and the Acting Director of the Bureau cited the Memorandum as authoritative, App. 39-41, 68. The Bureau has agreed that Rev.Rul. 54-161 reflected a "similar logic" to that in the Memorandum. App. 69. While it may be unfair to use unpublished rulings as authority against members of the public who had no access to them, we see no parallel unfairness in using such rulings against the agency that drafted them and cited them in a published decision. Indeed, the Bureau's assertion that its present interpretation is consistent with past interpretations, including that in the Memorandum, invites this inquiry
 
 
 [56]
 In his Order the Acting Director paraphrased and quoted pre-1949 examples of "numerous advisory letters to industry members and other concerned parties which had the effect of narrowing the pricing doctrine," App. 67, and of speeches by its spokesmen before industry groups and Congress. We are unable to evaluate the accuracy of the paraphrases or the context of the quotations since no citations to or copies of the documents were provided. In its brief the Bureau abandoned any reliance on these pre-1949 sources. We note, however, that these sources, as quoted or paraphrased, do not seem to support the Bureau's position. Rather, they may be interpreted as forbidding "tie-in" agreements, sales quotas, and the like, consistent with Advisory Memorandum No. 307 and Rev.Rul. 54-161
 
 
 [57]
 The Bureau's emphasis on the word "gift" implying a transaction for insufficient consideration has absolutely no support in the statute. Section 5(b)(3), 27 U.S.C. § 205(b)(3), prohibits wholesalers from "furnishing, giving, renting, lending, or selling to the retailer * * * other thing of value" under the proscribed conditions. Whether a given transaction is a "gift" or a "sale" is irrelevant; what matters is whether the transaction is conditioned upon an understanding or agreement that the retailer would purchase other products to the exclusion of the wholesaler's competitors. The Bureau's present interpretation disregards the presence or absence of such a condition, and thus alters the meaning and purpose of the statute
 
 
 [58]
 The Bureau has initiated a rulemaking proceeding that covers many of these issues, though neither of the parties to this appeal has brought it to the attention of the court. Notice of Proposed Rulemaking No. 327, 44 Fed.Reg. 45298 (Aug. 1, 1979)
 
 
 [59]
 Castlewood International Corp. v. Simon, 404 F.Supp. 88 (S.D.Fla.1975), rev'd on other grounds, 596 F.2d 638 (5th Cir. 1979), cert. granted, --- U.S. ----, 100 S.Ct. 2914, 64 L.Ed.2d 806 (Feb. 5, 1980)
 
 
 [60]
 After noting that the Act specifically authorizes the Bureau to promulgate regulations for enforcement of § 5(b), the Castlewood court said that it should employ the "arbitrary and capricious" standard of review. 404 F.Supp. at 92-93. "Under the circumstances in the present case," the court continued, to invalidate the Ruling "would be to proscribe the agency's powers to investigate and enforce its own regulations. The placing of such limitations (was) clearly not within the intent of Congress when it enacted the FAA Act." Id. at 93 (citing House Report, supra note 33; Treasury regulations, 26 C.F.R. § 601.328; and the Report of the Attorney General's Committee on Administrative Procedure at 99 (1941)). The relative lack of attention the court gave to the issue of the scope of § 5(b) is understandable, since the main question in Castlewood was the validity of the Ruling under the 21st Amendment, an issue that does not concern us here
 
 
 [61]
 Cf. Castlewood International Corp. v. Simon, 367 So.2d 613 (Fla.1979) (similar construction of analogous Florida law); In re Pennsylvania Whiskey Distributing Corp., 256 App.Div. 781, 11 N.Y.S.2d 718 (1939) (similar construction of analogous New York law)
 
 
 [62]
 Accord, Billik v. Berkshire, 154 F.2d 493 (2d Cir. 1946)
 
 
 [63]
 The Robinson-Patman Act provides in relevant part:
 It shall be unlawful for any person engaged in commerce, in the course of such commerce, * * * to sell, or contract to sell, goods at unreasonably low prices for the purpose of destroying competition or eliminating a competitor.
 Any person violating any of the provisions of this section shall, upon conviction thereof, be fined not more than $5,000 or imprisoned not more than one year, or both.
 15 U.S.C. § 13a (1976). See United States v. Nat'l Dairy Corp., 372 U.S. 29, 83 S.Ct. 594, 91 L.Ed.2d 561 (1963). Of course, we express no opinion concerning whether National's conduct violated the Robinson-Patman Act.
 
 
 [64]
 That the Sherman Act, 15 U.S.C. § 2 (1976), has the effect of outlawing some predatory below-cost pricing does not disturb this analysis. Proof that an incident of below-cost pricing violates the Sherman Act is a subtle and complex process, see Areeda & Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv.L.Rev. 697 (1975), rarely successfully undertaken. See Koller, The Myth of Predatory Pricing An Empirical Study, 4 Antitrust L. & Econ.Rev. 105 (1971); Telser, Cutthroat Competition and the Long Purse, 9 J.L. & Econ. 259 (1966). Even if the Bureau had the authority to enforce the Sherman Act's predatory pricing component through the Federal Alcohol Administration Act, it made no pretense of proving a Sherman Act violation in this case
 
 
 [65]
 In Continental Distilling Corp. v. Humphrey, 220 F.2d 367 (D.C.Cir.1954), relied upon by the Bureau, this court reversed a District Court order dismissing an action for declaratory and injunctive relief from a ruling of the Bureau's predecessor agency, the Alcohol and Tobacco Tax Division of the Bureau of Internal Revenue, and remanded the case to the District Court for factual findings concerning the reasonableness or arbitrariness of a classification created by the ruling. Thus the case is distinguishable since it involved "questions of fact," id. at 372, rather than questions of law as in this case. In any event, Continental Distilling mandates a searching and careful judicial scrutiny of agency action, however narrow the ultimate standard of review may be. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)
 
 
 [66]
 With respect to factual issues, this court must apply a "substantial evidence" test. 27 U.S.C. § 204(h). We do not need to resolve any factual issues here
 
 
 [67]
 The Supreme Court has used the term "legislative-type rule" to distinguish an agency's issuance of regulations or rules under a congressional grant of authority from an agency's interpretation and effectuation of the specific terms of a statute. Morton v. Ruiz, 415 U.S. 199, 236, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974)
 
 
 [68]
 Subsections 5(b)(3) and (6) authorize the Bureau to prescribe regulations exempting certain types of transactions from the coverage of the Act. This authority is exercised in 27 C.F.R. §§ 6 & 8 (1979). No other power to legislate is granted to the Bureau by § 5(b)
 
 
 [69]
 Significantly, the rulings relied upon by the Bureau in this case were apparently not issued after notice-and-comment rulemaking. This proves that the Bureau considers them "interpretative" in nature. See Joseph v. U.S. Civil Service Comm'n, 554 F.2d 1140, 1152-1154 (D.C.Cir.1977). The rulemakings initiated by Notice of Proposed Rulemaking No. 327, supra note 58, 44 Fed.Reg. 45298, may signify a shift in the Bureau's interpretation of its legislative-type power under § 5(b)