(No. 64579.—

TED SHARPENTER, INC., Appellant, v. THE ILLINOIS LIQUOR CONTROL COMMISSION *et al.*, Appellee.

*Opinion filed December 21, 1987.—Rehearing*
*denied February 2, 1988.*

SIMON, J., took no part.

David S. Acker and James L. Long, of Chicago (Winston & Strawn, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart and Shawn W. Denney, Solicitors General, and William D. Frazier, Assistant Attorney General, of Chicago, of counsel), for appellee Illinois Liquor Control Commission.

George W. Keeley, of Chicago (Halfpenny, Hahn & Roche, of counsel), for appellees Ronald Nichols *et al.*

John P. Ryan, Jr. and Steven B. Varick, of McBride, Baker & Coles, of Chicago, for *amicus curiae* Anheuser-Busch Companies, Inc.

Herman G. Bodewes and Bridget E. Madigan, of Giffin, Winning, Lindner, Cohen & Bodewes, P.C., of Springfield, for *amicus curiae* Associated Beer Distributors of Illinois *et al.*

JUSTICE MORAN delivered the opinion of the court:

In November of 1983, Patrick Burke, Richard Ernzen, James McCue, Ronald Nichols and George Zobrest filed a complaint with the Illinois Liquor Commission (Commission) charging that Ted Sharpenter, Inc.'s, practice of offering preferential price discounts violated the Liquor Control Act of 1934 (the Act) (Ill. Rev. Stat. 1983, ch. 43, par. 93.9 *et seq.*). A hearing was subsequently held and the Commission found that Sharpenter's pricing policy violated sections 6—5 and 6—17 of the Act (Ill. Rev. Stat. 1983, ch. 43, pars. 122, 133). Thereafter, Sharpenter (plaintiff) filed a complaint for administrative review against the Commission and named individuals (defendants) in the circuit court of Kane County and the court reversed, holding that the plaintiff's pricing practices did not violate either section 6—5 or 6—17 of the Act. The appellate court reversed, holding that plaintiff's pricing practices violated section 6—5. (148 Ill. App. 3d 936.) We granted leave to appeal. 107 Ill. 2d R. 315.

Several issues are raised on appeal; however, because of our disposition of the case it is only necessary that we consider the following issue: whether plaintiff's practice of offering preferential price discounts violates section

6—5 of the Act, which prohibits distributors from giving "anything of value" to retailers.

Plaintiff is a wholesale beer distributor and the exclusive distributor of G. Heilman Brewing Company products within its designated four-county sales territory. Exclusive distributorships such as plaintiff's are permitted by statute (Ill. Rev. Stat. 1983, ch. 43, par. 301 *et seq.*). Any retailer located within plaintiff's sales territory who wishes to sell Heilman products must purchase them from plaintiff. Plaintiff, in turn, may not sell Heilman products to retailers located outside of its sales territory. Ill. Rev. Stat. 1983, ch. 43, par. 305(5).

Plaintiff has been the exclusive distributor of Heilman products for the past 50 years. Over the past 20 years, plaintiff has maintained a preferential discount system based upon the type of retail operation. Plaintiff divides its 350 retail accounts into three categories: "off-premise" accounts are retailers which sell beer for off-premise consumption such as liquor stores and packaged-goods stores; "on-premise" accounts consist of bars and taverns; and "combo" accounts are retailers which sell beer for both on- and off-premise consumption such as a tavern with an adjoining liquor store.

Under plaintiff's preferential discount system, off-premise retailers are offered larger and more frequent discounts than on-premise retailers. These large discount programs are only offered to off-premise retailers if they agree to both purchase a minimum quantity of beer and engage in "good faith" promotional efforts. Plaintiff broadly defines "good faith" promotional efforts to include such practices as newspaper advertising, in-store advertising or any other activity which might emphasize the discounted item. These discount programs are offered eight or nine times per year and are from one to two weeks in duration.

Two or three times per year plaintiff offered a lesser discount to on-premise retailers. These discounts were not contingent upon a minimum purchase or promotional efforts. On-premise retailers received a discount of $.50 per case, while off-premise retailers received a $1.10-per-case discount. Retailers who operated combo stores generally received both types of discounts in relation to the percentage of their business which was on-premise and that which was off-premise.

Plaintiff's president, Robert Sharpenter, testified at the hearing before the Commission that he maintains his dual discounting system because of differences in the nature of on-premise and off-premise beer retailing. Sharpenter explained that off-premise retailers compete in a very price-sensitive market so that when discounts are given, they, in turn, lower the price of the item and this lower price, when coupled with promotional efforts, results in substantial increases in sales. Plaintiff therefore receives substantial volume increases by offering these discounts to off-premise retailers. Sharpenter stated that these discounts generate from 2 to 20 times the normal volume of sales. By contrast, Sharpenter explained, beer sales for on-premise consumption is not as price sensitive. On-premise beer consumers are motivated more by product loyalty than by price and, in addition, most brands of beer are sold at standard prices. Consequently, when on-premise retailers receive a discount they do not lower the price or promote the beer and as a result there is no increase in sales. Thus, as Sharpenter testified, "he gets the discount and we only get our normal volume." According to Sharpenter, the purpose of discounts to on-premise retailers is only to create good will.

Individual defendants are all on-premise and combo retailers located within plaintiff's sales territory. Each testified that they had attempted to obtain the greater

discount from plaintiff for on-premise sales but were refused. Each stated that they would be willing to buy the minimum quantity and promote the product in order to obtain the greater discount. Several testified that plaintiff was their only distributor who maintained a dual-discount policy based upon the type of retail operation; however, they also stated that other distributors offered varying discounts based upon volume.

Section 6—5 of the Act provides in pertinent part:

"Except as provided below, it is unlawful for any manufacturer or distributor or importing distributor to give or lend money *or anything of value*, or otherwise loan or extend credit (except such merchandising credit) directly or indirectly to any retail licensee or to the manager, representative, agent, officer or director of such licensee." (Emphasis added.) Ill. Rev. Stat. 1983, ch. 43, par. 122.

Defendants claim that plaintiff's dual-discounting policy constitutes a proscribed thing "of value" under section 6—5. They assert that the larger discounts given to off-premise retailers bestows a thing of value upon such retailers. They claim that while section 6—5 does not prohibit all discounts, it does prohibit those which do not operate equally upon all retailers since any special advantage given to a retailer or class of retailers would constitute a thing of value.

Plaintiff asserts that section 6—5 was not intended to reach the pricing policies of distributors. It argues that the phrase "anything of value," when read in context, was only meant to prohibit the giving of such things as equipment, money or credit since these things would permit a distributor to acquire an interest in the retail outlet and thereby exercise dominion over it. As so understood, it contends that section 6—5 was not violated here as there was no evidence that its discount policy led to the domination of any retailer.

Section 6—5 was intended to remedy a competitive abuse in the beer industry referred to as the "tied house." By the granting of gifts and loaning of money to retailers, distributors could effectively "tie" themselves to retailers to the point of excluding all competitors. This form of vertical integration between beer distributing and retailing allowed the distributor to exercise almost complete control over the retailers. "The interest of a particular brewery in promoting its product in a given area went to the point of determining location, asserting control over the licensee, and, through the power of credit and the use of equipment, it was, in fact, in the practical retail sale of beer." (*Weisberg v. Taylor* (1951), 409 Ill. 384, 390.) Tied houses became associated with such evils as political corruption, intemperance and the irresponsible ownership of taverns (*National Distributing Co. v. United States Treasury Department, Bureau of Alcohol, Tobacco, & Firearms* (D.C. Cir. 1980), 626 F.2d 997, 1009), and the legislature therefore sought to prohibit the gifts and loans which made them possible. "The evils of the 'tied house' have long been recognized and most, if not all, of the States, including our own, have prohibited the furnishing by manufacturers or distributors of buildings, bars, equipment, or loans of money to a retailer." *Weisberg v. Taylor* (1951), 409 Ill. 384, 388.

Defendants contend that the phrase "anything of value" must be construed so as to prohibit plaintiff from offering differing discounts based upon the nature of the retail operation. They argue, in effect, that the phrase should be read so as to prohibit discriminatory pricing. We disagree. Nothing in the phrase indicates to us that it was intended to create a blanket prohibition against price discrimination. Rather, as previously noted, the legislature merely sought to proscribe the giving of things of value in order to prevent tied houses and all of their

attendant evils. While price discrimination in this context may not necessarily be desirable, section 6—5 simply does not proscribe it. (Accord *Burger Brewing Co. v. Thomas* (1975), 42 Ohio St. 2d 377, 329 N.E. 2d 693; *cf. Lake County Beverage Co. v. 21st Amendment, Inc.* (Ind. App. 1982), 441 N.E.2d 1008 (wherein the court interpreted an Indiana statute which provides: "It is unlawful for a permittee in a sale or contract to sell alcoholic beverages to discriminate between purchasers by granting a price, discount, allowance, or service charge which is not available to all purchasers at the same time." (Ind. Code 7.1—5—5—7 (1980))).) Moreover, we find it significant that while defendants urge that section 6—5 prohibits price discrimination, they do not argue that volume discounts should be proscribed even though such discounts are discriminatory in the sense that they disfavor retailers unable to purchase in large quantity.

In *National Distributing Co. v. United States Treasury Dept.* (D.C. 1980), 626 F.2d 997, the court construed similar language in the Federal tied house statute. That statute provides in relevant part:

> "(b) 'Tied house'
>
> To induce through any of the following means, any retailer, engaged in the sale of distilled spirits, wine, or malt beverages, to purchase any such products from such person to the exclusion in whole or in part of distilled spirits, wine, or malt beverages sold or offered for sale by other persons in interstate or foreign commerce * * *.
>
> * * *
>
> (3) by furnishing, giving, renting, lending, or selling to the retailer, any equipment, fixtures, signs, supplies, money, services, *or other thing of value* * * *." (Emphasis added.) (27 U.S.C. 205(b) (1982).)

National, a wine distributor, had sold wine at below its own cost to retail outlets throughout a particular county. The Bureau of Alcohol, Tobacco and Firearms argued

that below-cost sales, without justification, constituted the furnishing of a "thing of value" as the difference between what the distributor paid and the price it was sold to the retailer. After thoroughly reviewing the legislative history, the court concluded that the "giving *** [of] other thing [*sic*] of value, 27 U.S.C. §205(b)(3), when read in the context of the statute as a whole, does not prohibit below-cost pricing." (*National Distributing Co. v. United States Treasury Department, Bureau of Alcohol, Tobacco, & Firearms*, 626 F.2d 997, 1020.) The court reasoned that "[i]n the absence of any indication that National's price cut had the purpose or effect of gaining control over retail outlets in Leon County, we doubt whether the Act can have any application." 626 F.2d 997, 1004.

Defendants point to certain language in *National* that only nondiscriminatory and unconditional below-cost sales do not constitute the giving of a thing of value. By inference, they argue that *National* is support for their position inasmuch as the plaintiff's discount policy discriminated against off-premise retailers and was conditioned upon the purchase of a minimum quantity and promotional efforts. A closer reading of *National*, however, indicates that the court was only referring to price discriminations and conditions which were instituted for the purpose of, or had the effect of, obtaining control over retail outlets. The court stated that "[p]rice cuts are prohibited by the Act only when they are coupled with an agreement or understanding that a retailer will buy other products of the wholesaler or producer to the exclusion of competitors, or when they lead to domination and control of a retail outlet by the wholesaler or producer." (626 F.2d 997, 1020.) As such, *National* cannot be read as authority for the proposition that preferential discount policies which are enacted, as here, solely

in order to increase sales, constitutes the giving of a thing of value.

Plaintiff contends that a distributor's pricing practices can never constitute a violation of section 6—5. We disagree. There is, in our view, always the potential that a distributor may offer a preferential discount in order to gain control over the advantaged retailers. A distributor might furtively grant large discounts to impermissibly influence retailers and therefore violate section 6—5. In this respect, we agree with the court in *National* that "[i]n some circumstances a pricing arrangement might be used as a 'subterfuge' to disguise a grant of financial assistance given to create a tied house, or to obtain an exclusive sales agreement." (*National,* 626 F.2d at 1004.) Here, however, all of the testimony before the Commission indicates that plaintiff maintained its preferential discount policy for competitive reasons. There was no suggestion that plaintiff's discount policy was anything but an exercise of business judgment to increase sales. There was no evidence that a tied house relationship between plaintiff and any of its retailers had been either attempted or created. We therefore hold that section 6—5 is inapplicable here where plaintiff maintains a preferential discount policy not to create a tied house but only to increase the volume of sales. Accordingly, we reverse the judgment of the appellate court and affirm the order of the trial court.

*Appellate court reversed;*
*circuit court affirmed.*

JUSTICE SIMON took no part in the consideration or decision of this case.