**FOREMOST SALES PROMOTIONS, INC., an Illinois Corporation, Plaintiff–Appellee,**

v.

**DIRECTOR, BUREAU OF ALCOHOL, TOBACCO AND FIREARMS and David R. Chupp, Midwest Regional Regulatory Administrator, Defendants–Appellants.**

No. 87–2346.

United States Court of Appeals, Seventh Circuit.

Argued May 31, 1988.

Decided Sept. 23, 1988.

William T. Calbault, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for defendants-appellants.

Allen H. Schultz, Schultz & Schultz, Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, and CUMMINGS and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

The Bureau of Alcohol, Tobacco and Firearms (the "Bureau") appeals from a summary judgment holding that distributors of alcoholic beverages may pay to have their products included in newspaper advertisements run by Foremost Sales Promotions, Inc. ("Foremost") without violating section 5 of the Federal Alcohol Administration Act (the "FAA Act"). The suit was prompted by the Bureau's enforcement action against a liquor distributor that paid Foremost to have its products appear in the Foremost ads. The Bureau, which regards Foremost as a representative of the retail liquor stores that are listed in the advertisements, contended that the distributor's payments violated statutory restrictions on commercial relationships between distributors and retailers. The distributor settled the enforcement action by paying $20,000 and agreeing to cease dealing with Foremost. Foremost brought suit to remove the legal threat to its business.

On appeal, the Bureau maintains that Foremost, which cannot be prosecuted directly under the FAA Act, lacks standing to challenge the Bureau's regulation of suppliers and wholesalers. The Bureau also argues that declaratory judgment was inappropriate on the merits because the Bureau's actions were authorized by the "tied house" and "commercial bribery" provisions of the FAA. 27 U.S.C. § 205(b)–(c) (1982).

We find that Foremost has standing. On the merits, we find that the district court, though partially correct in its statement of the governing legal standard, erred in its characterization of the record. Because we are reluctant to analyze the lengthy documentary record in this case without benefit of the parties' views on the application of the legal standard elaborated below, we remand for reconsideration of the summary judgment motions and for any further proceedings that may be appropriate.

## I.

Foremost, a closely held Illinois corporation, operates a loosely structured franchise program for independently owned liquor stores in Illinois and Florida, principally in the Chicago and Sarasota areas. In 1982, there were fifty-four Foremost franchisees in Illinois and sixteen in Florida. Foremost has two revenue sources: franchise fees paid by alcoholic beverage retailers and subscription fees paid by suppliers. Franchisees pay an annual fee plus additional charges for each advertisement that Foremost places. In exchange for these payments and the acceptance of certain restrictions on store location and independent advertising, franchisees are listed in Foremost's newspaper advertisements, which publicize weekly specials at all Foremost stores. Franchisees are notified of the weekly specials by newsletter two weeks in advance of the advertisement to enable them to increase stocks of featured items. Franchisees are under no contractual obligation to charge the advertised prices or to stock sufficient quantities of the featured items to meet demand. Foremost also offers a number of optional services to franchisees, primarily consultation on various retail management topics.

Distributors pay subscription fees that vary across a range of promotional packages. The principal benefit to a subscribing distributor is a guarantee that its product will be featured in a specified number of advertisements. Products of nonparticipating distributors are sometimes featured, but far less frequently than the competing products of subscribers. Some of the packages that Foremost offers to distributors include in-store promotions with floor stackings, pennants and window displays; other packages include the option to purchase these additional services for set fees. Subscribing suppliers are under no obligation to reduce wholesale prices on featured items. Foremost's financial data for its Chicago-area operations show that during the period from 1979 through 1981 this part of the company would have incurred a substantial loss if it had been unable to collect subscription fees.

The legality of Foremost's subscription program was called into question by an enforcement action initiated in 1979. Responding to a complaint by a nonparticipating distributor, the Bureau conducted a nine-month investigation focusing on Hiram Walker Distributing Company ("Hiram Walker"), a Foremost subscriber with several brands that had appeared regularly in Foremost advertisements. The Bureau concluded that Hiram Walker's payments to Foremost constituted indirect payments to Foremost retailers which induced those retailers to increase their purchases of Hiram Walker products and decrease purchases of competing products. The Bureau found that Hiram Walker's participation in the Foremost program violated the FAA's prohibitions on "tied house" arrangements between suppliers and retailers and on "commercial bribery" of trade buyers. 27 U.S.C. § 205(b)–(c) (1982).[1]

The tied house provisions prohibit suppliers from "inducing" retailers to purchase their products "to the exclusion in whole or in part" of other suppliers' products by, among other means, "paying or crediting the retailer for any advertising, display, or

---

1. The relevant sections of the FAA Act state:
   § 205. Unfair competition and unlawful practices
   It shall be unlawful for any person engaged in business as a distiller, brewer, rectifier, blender, or other producer, or as an importer or wholesaler, of distilled spirits, wine, or malt beverages, or as a bottler, or warehouseman and bottler, of distilled spirits, directly or indirectly or through an affiliate:

   .     .     .     .     .

   (b) "Tied house"
   To induce through any of the following means, any retailer, engaged in the sale of distilled spirits, wine, or malt beverages, to purchase any such products from such person to the exclusion in whole or in part of distilled spirits, wine, or malt beverages sold or offered for sale by other persons in interstate or foreign commerce, if such inducement is made in the course of interstate or foreign commerce, or if such person engages in the practice of using such means, or any of them, to such an extent as substantially to restrain or prevent transactions in interstate or foreign commerce, in any such products, or if the direct effect of such inducement is to prevent, deter, hinder, or restrict other persons from selling or offering for sale any such products to such retailer in interstate or foreign commerce:

   .     .     .     .     .

   (3) by furnishing, giving, renting, lending, or selling to the retailer, any equipment, fix-tures, signs, supplies, money, services, or other thing of value, subject to such exceptions as the Secretary of the Treasury shall by regulation prescribe, having due regard for public health, the quantity and value of articles involved, established trade customs not contrary to the public interest and the purposes of this subsection; or (4) by paying or crediting the retailer for any advertising, display, or distribution service; ...

   .     .     .     .     .

   (c) Commercial bribery
   To induce through any of the following means, any trade buyer engaged in the sale of distilled spirits, wine, or malt beverages, to purchase any such products from such person to the exclusion in whole or in part of distilled spirits, wine, or malt beverages sold or offered for sale by other persons in interstate or foreign commerce, if such inducement is made in the course of interstate or foreign commerce, or if such person engages in the practice of using such means, or any of them, to such an extent as substantially to restrain or prevent transactions in interstate or foreign commerce in any such products, or if the direct effect of such inducement is to prevent, deter, hinder, or restrict other persons from selling or offering for sale any such products to such trade buyer in interstate or foreign commerce: (1) By commercial bribery; or (2) by offering or giving any bonus, premium, or compensation to any officer, or employee, or representative of the trade buyer....

distribution service." 27 U.S.C. § 205(b)(4) (1982). Section 6.52 of the Bureau's regulations elaborate on the advertising restriction, specifying that "[a]n arrangement in which an industry member [i.e., a producer or distributor] participates with a retailer in paying for an advertisement placed by the retailer constitutes paying the retailer for advertising within the meaning of the Act." 27 C.F.R. § 6.52 (1987). The commercial bribery provisions impose similar restrictions on a broader range of transactions. They prohibit a seller from employing specified means of inducing "trade buyers," a term encompassing wholesalers and retailers, from purchasing the seller's products to the "exclusion in whole or in part" of other sellers' products. Prohibited inducements include "commercial bribery" and the "offering or giving [of] any bonus, premium, or compensation to any officer, or employee, or representative of the trade buyer." 27 U.S.C. § 205(c)(1)–(2) (1982). Section 10.21 of the regulations states that violations may occur even when inducements are not "offered or given for the purpose of directly inducing a trade buyer to purchase from the seller." 27 C.F.R. § 10.21 (1988).

In September 1981, the Bureau advised Hiram Walker that the Bureau had found the company in violation of section 5 of the FAA Act. The Bureau promptly settled the case and resumed processing Hiram Walker's applications for new "basic permits" for its Midwest and Western Regions in return for an offer in settlement of $20,000 and the distributor's promise to cease dealing with Foremost. Foremost then brought suit in district court seeking

declaratory and injunctive relief against the Bureau.[2]

## II.

■ The Bureau first argues that Foremost, as the franchisor and agent of retail liquor stores, lacks standing to challenge the Bureau's enforcement of section 205 against producers and distributors of alcoholic beverages. The Bureau concedes that Foremost meets the requirements of article III standing, that Foremost has suffered an actual injury fairly traceable to the Bureau's determinations that wholesalers' and distributors' participation in cooperative advertising programs violates section 5 of the FAA. *See Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); *City of Milwaukee v. Block*, 823 F.2d 1158, 1164 (7th Cir.1987). Standing, however, may also be blocked by court-imposed "prudential" limitations. *See Gladstone, Realtors*, 441 U.S. at 103 n. 9, 99 S.Ct. at 1609 n. 9; *City of Milwaukee*, 823 F.2d at 1164. The Bureau contends that Foremost fails to meet this second aspect of the standing inquiry. The Bureau points out that Congress scrupulously avoided imposing any restrictions on the activities of retailers when it enacted the FAA because the twenty-first amendment had delegated authority to regulate retail sales to the states. It argues that Foremost, which the Bureau characterizes as an agent for various retailers, does not assert a claim within the zone of interests protected by the FAA and that there is no indication that Congress intended for courts to entertain challenges to BATF enforcement actions by plaintiffs like Foremost.[3]

---

2. The Bureau initially sought to bring this appeal before a final judgment had been entered. We declined to act for lack of appellate jurisdiction. *See Foremost Sales Promotions, Inc. v. Director, Bureau of Alcohol, Tobacco & Firearms*, 812 F.2d 1044 (7th Cir.1987). On June 30, 1987, the district court issued an order clarifying its decision to deny injunctive relief and changing its memorandum opinion and order to a memorandum opinion. (Neither of these changes appears in the published opinion we have cited.) On July 6, 1987, the district court entered a rule 58 final judgment order. The Bureau then brought this appeal, properly in-

voking appellate jurisdiction under 28 U.S.C. § 1291 (1982).

3. One suit by a liquor retailer to enjoin BATF enforcement of restrictions on wholesale price discounts was decided by the district court, reversed by the court of appeals, vacated and remanded by the Supreme Court and reinstated by the court of appeals without any consideration of whether the retailer had standing to challenge BATF regulations. *Castlewood Int'l Corp. v. Simon*, 404 F.Supp. 88 (S.D.Fla.1975), *rev'd*, 596 F.2d 638 (5th Cir.1979), *vacated and remanded sub nom. Miller v. Castlewood Int'l Corp.*, 446 U.S. 949, 100 S.Ct. 2914, 64 L.Ed.2d

Defendants rely on an overly restrictive view of the "zone of interest" inquiry. In *Clarke v. Securities Industry Association,* 479 U.S. 388, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987), the Supreme Court discussed the principles that govern the prudential aspect of the standing inquiry in cases involving agency actions made "presumptively reviewable" by section 10 of the Administrative Procedure Act, 5 U.S.C. § 702 (1982).[4] The Court observed that

> In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

107 S.Ct. at 757 (footnote omitted). The review provisions of the APA, in other words, are to be interpreted "not grudgingly but as serving a broadly remedial purpose." *Association of Data Processing Orgs., Inc. v. Camp,* 397 U.S. 150, 156, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970) (hereinafter *"ADAPSO"*); *City of Milwaukee,* 823 F.2d at 1165. In keeping with this view, the Court has repeatedly held that competitors of regulated entities, though not directly subject to a challenged agency action, may nevertheless challenge that action if the aggrieved party's interest bears a plausible relationship to the policies underlying the authorizing statute. *Clarke,* 107 S.Ct. at 754–59; *see ADAPSO,* 397 U.S. at 157, 90 S.Ct. at 832; *see also Panhandle Producers & Royalty Owners Ass'n v. Economic Regulatory Admin.,* 822 F.2d

1105, 1109 (D.C.Cir.1987) ("Competitors have a seemingly unbroken record of success in securing standing to challenge decisions involving agency licensing.").

This case presents a variation on the more typical alignment of interests addressed in *Clarke* and *ADAPSO.* Plaintiffs in those cases, entities not directly subject to the challenged agency actions, sought standing to show that an agency had allowed their regulated competitors excessive freedom to encroach on the plaintiffs' economic turf. Foremost, also an unregulated entity, seeks standing to establish that the agency has unduly restricted the freedom of its regulated partners to engage in activities that redound to Foremost's benefit. The situation before us is less common but not without precedent. In *Cotovsky–Kaplan Physical Therapy Associates, Ltd. v. United States,* 507 F.2d 1363 (7th Cir.1975) (Stevens, Circuit Judge), this court held that a for-profit physical therapy corporation had standing to challenge a Medicare regulation requiring agencies that arranged care for Medicare participants to replace for-profit with non-profit service providers. *Id.* at 1365–67. *Cotovsky–Kaplan* relied on *Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942), in which CBS was permitted to challenge regulations that made local stations' licenses contingent on adherence to certain restrictions in their contracts with radio networks. The absence of any direct regulation of CBS or its contracts with the local stations did not deprive the network of standing where the regulations "operate[d] to alter and affect adversely appellant's contractual rights and business relations with station owners." *Id.* at 422, 62 S.Ct. at 1203.[5]

---

806, *reinstated,* 626 F.2d 1200 (5th Cir.1980) (per curiam).

**4.** The Bureau has not claimed that its efforts to end supplier participation in Foremost's promotions do not represent agency action within the ambit of 5 U.S.C. section 702. *See Chicago Truck Drivers, Helpers & Warehouse Workers Union v. National Mediation Bd.,* 670 F.2d 665, 668 (7th Cir.1981). Its reliance on section 702 standing cases, in fact, implies that the Bureau accepts the relevance of this section.

**5.** *Columbia Broadcasting System* found that the FCC regulations governing local stations were reviewable under the Urgent Deficiencies Act of 1913, 38 Stat. 219, as incorporated by section 402(a) of the Communications Act of 1934, 48 Stat. 1093. The fact that this case arises under the APA instead does not detract from the relevance of the Court's view that standing was "unaffected by the fact that the regulations [were] not directed to appellant and [did] not in terms compel action by it or impose penalties

We see no basis for distinguishing the present case from *Cotovsky–Kaplan* and *Columbia Broadcasting System*. The legislators who enacted the FAA Act were deeply concerned about the effect of vertical integration in the alcoholic beverage industry on the social costs of legalizing alcohol. *See National Distrib. Co. v. U.S. Treasury Dep't,* 626 F.2d 997, 1006–10, (D.C.Cir.1980). The Bureau concedes that Congress was vitally interested in dealings between retailers and their suppliers, but insists that "[t]o the extent [the FAA Act] protects the interests of the retailers, that protection is incidental to the protection of the consuming public." Brief for Defendants–Appellants at 32. Retailers' interests in restraining overreaching under the FAA Act, however, are no more "incidental" to the broader public interest than are the interests of for-profit service providers in challenging overly stringent Medicare restrictions or the interests of radio networks in challenging unwarranted restrictions on contracts between local stations and the networks. The district court properly found standing.

### III.

Foremost's central challenge to the Bureau's enforcement actions against distributors that participate in its promotion program rests on the construction of language, found in both the tied house and commercial bribery provisions, which makes it illegal to "induce" a buyer to purchase alcoholic beverages "to the exclusion in whole or in part of [alcoholic bever-

ages] sold or offered for sale by other persons." 27 U.S.C. § 205(b)–(c) (1982).[6] In construing this language the district court relied on *National Distributing,* which involved an enforcement action against a distributor for selling one brand of wine at a price below the inventory cost. The D.C. Circuit concluded, after an exhaustive review of the structure, legislative history and judicial and administrative application of section 5, that the tied house provisions do not prohibit suppliers from cutting prices, even from selling below cost, "so long as [the price cut] is not connected with an agreement or understanding to purchase products from one wholesaler to the exclusion of others." 626 F.2d at 1016. The district court relied on *National Distributing* as authority for the proposition that sections 5(b) and 5(c) prohibit only arrangements that result in "vertical integration which would allow suppliers to do business with a retailer, free from competition with other suppliers." *Foremost Sales Promotions, Inc. v. Director, Bureau of Alcohol, Tobacco & Firearms,* 642 F.Supp. 1025, 1030 (N.D.Ill.1986). The district court found that Foremost's operation fell far short of exerting this effect. In fact, the court found "evidence that sales for unadvertised items remained constant during the week when a competitor was featured in the Foremost ad." *Id.* Accordingly, the district court granted summary judgment for the plaintiff. The Bureau raises challenges to both the factual and legal bases for the district court's ruling. We take these up separately.

upon it because of its action or failure to act." 316 U.S. at 422, 62 S.Ct. at 1202–03.

**6.** Foremost also asserts that because its franchisees (though it is not clear whether this includes Florida as well as Illinois outlets) purchase exclusively from in-state wholesalers, the supplier subscription program attacked by the Bureau could not have affected sales "in interstate or foreign commerce" as required by the FAA Act. *See* 27 U.S.C. § 205(b), (c) (1982). This assertion is meritless. Unlike the sales of asphalt manufactured, purchased and used in California, that the Court considered in *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 95 S.Ct 392, 42 L.Ed.2d 378 (1974), a case that construed the "in commerce" requirement of the Robinson–Patman and Clayton Acts, the alco-

holic beverage sales to Foremost franchisees represented one link in the "generation ... transport and distribution to the consumer" of goods moving in interstate commerce. *Id.* at 195, 95 S.Ct. at 398. Thus, assuming that Foremost is correct and the interstate commerce requirement of the FAA Act is construed as strictly as the "in commerce" requirement of the Robinson–Patman and Clayton Acts, the requirement is met in this case. *See also Levers v. Anderson,* 153 F.2d 1008, 1010 (10th Cir.) (exclusive outlet and tied house provisions "are not limited to sales in interstate commerce but embrace practices which substantially restrain or prevent transactions in interstate commerce"), *cert. denied,* 328 U.S. 866, 66 S.Ct. 1376, 90 L.Ed. 1636 (1946).

## A.

We agree with the Bureau's objection to the finding that Foremost's advertisements did not affect sales of brands in competition with the featured brands. In considering Foremost's motion for summary judgment, the district court was obliged to resolve all contested issues of fact in the Bureau's favor. *See, e.g., Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). This was not done. The finding that Foremost retailers increased their sales of featured items without experiencing losses in their sales of competing brands appears to have been based on the deposition of Kevin Zee, the manager of a Foremost retail store. Zee stated "I do not reduce inventory of an item just because ... another item is advertised, because the item that is nôt advertised will still continue to sell at its regular price." Deposition of Kevin Zee at 24 (Jan. 4, 1983), *quoted in Foremost,* 642 F.Supp. at 1028. Read in isolation, this statement only softly suggests the view that was adopted as hard, uncontested fact by the district court; an item may "continue to sell" without maintaining its prior rate of sales and a retailer may maintain a constant inventory of an item without maintaining a constant rate of purchases. More important, the record also includes contrary statements from owners of other Foremost stores indicating that they responded to Foremost newsletters by increasing purchases of featured items and decreasing purchases of competing, nonfeatured items.[7]

If the declaratory judgment depended on Foremost's establishing that its advertising promotions had no effect whatever on the sales of nonfeatured brands, we would be obliged to reverse or remand in view of this evidence. However, as the district court's interpretation of *National Distributing* suggests, the factual burden on Foremost is not nearly so heavy as the district court's discussion of the evidence seems to imply. If the tied house and commercial bribery provisions apply only to arrangements that are intended to give sellers substantial control over purchasers, or that threaten to produce substantial control, then Foremost need not show that its subscribers' advertising expenditures had no effect on competitors' sales. We therefore turn to the construction of the tied house and commercial bribery provisions, beginning with the D.C. Circuit's thorough analysis of section 5 in *National Distributing.*

## B.

Superficial distinctions between *National Distributing* and the present case are readily apparent. *National Distributing* involved nondiscriminatory, below-cost pricing prosecuted under subsection 5(b)(3) of the FAA Act; the present case involves indirect advertising subsidies that the Bureau views as violations of subsections 5(b)(4) and 5(c)(2). Although *National Distributing* alludes repeatedly to the specific violation at issue there, the court's general approach to interpreting the FAA Act, a well-founded approach in our view, finds ready application in this case.

*National Distributing*'s conclusion that the FAA Act does not prohibit price competition among distributors in the absence of the threat of supplier control depends

---

7. *See* Affidavit of Donald Kosh at 1 (Mar. 11, 1980) ("[W]hen a brand is featured in an ad I buy and sell more of it than when it isn't featured. I also buy less of other similar brands to the items that are featured."), *reprinted in* I Appendix for Defendants–Appellants at 28; Affidavit of David Soifer at 1–2 (Mar. 4, 1980) ("As a result [of Foremost's promotions of Hiram Walker brands] I have bought and sold more of Hiram Walker and less of Schenley and Seagrams brands in 1978 and 1979 than in previous years."), *reprinted in* I Appendix for Defendants–Appellants at 25–26; Deposition of David Soifer at 61–62 (May 19, 1983) (testifying that sales of nonfeatured items decline), *reprinted in* II Appendix for Defendants–Appellants at 497–98.

Even Zee's deposition, upon which the district court appears to have relied, contains some support for the proposition that increased sales of featured items were accompanied by decreased sales of nonfeatured items. Zee stated that some customers come into his store without a clear brand preference in a particular product line and that price influenced these customers' choices. Deposition of Kevin Zee at 25 (Jan. 4, 1983), *reprinted in* II Appendix for Defendants–Appellants at 558.

heavily on the court's interpretation of the purposes of section 5. The court succinctly stated its views on this point as follows:

> The primary purpose of the "Exclusive outlet," "Tied house," and "Commercial bribery" subsections of Section 5 seems to be prevention of a form of vertical integration whereby wholesalers or producers might gain effective control of ostensibly independent retail outlets. In the absence of any indication that National's price cut had the purpose or effect of gaining control over retail outlets in [its market area], we doubt whether the Act can have any application.

626 F.2d at 1004 (footnote omitted); *see also Ted Sharpenter, Inc. v. Illinois Liquor Control Comm'n*, 119 Ill.2d 169, 176–78, 115 Ill.Dec. 603, 606–07, 518 N.E.2d 128, 131–32 (1987) (similar legislative purposes inform interpretation of Illinois' tied house provisions). The court supported this interpretation with a detailed review of the legislative history of the FAA Act, two aspects of which are particularly relevant here. First, when the FAA was enacted in 1935, many Senators and Representatives were concerned that high liquor prices, attributed to the "whiskey trust" and, to a lesser extent, to the federal excise tax on liquor, would provide continuing encouragement to the bootleggers who had flourished during Prohibition. Congress acted on this concern by deleting prohibitions against destructive price cutting when it fashioned the FAA Act from the Code of Fair Competition for the Alcoholic Beverage Wholesale Industry, a body of regulatory controls that had been promulgated under the National Industrial Recovery Act.[8] *National Distributing* found that, while legislators disagreed as to specific corrective measures, "in both Houses of Congress there appeared to be total unanimity on the conclusion that lower prices were desirable." 626 F.2d at 1008.[9] Second, the *National Distributing* court found that the tied house provisions were enacted to prevent the growth of a particular mode of organization that legislators associated with the "serious social and political evils which were in large measure responsible for bringing on prohibition." S.Rep. No. 1215, 74th Cong., 1st Sess. 7 (1935), *quoted in National Distributing*, 626 F.2d at 1008. These evils included political corruption, which many legislators associated with large, vertically integrated suppliers, the proliferation of saloons and bars, which was linked to suppliers' operation of exclusive outlets, excessive consumption caused by captive outlets' efforts to meet quotas imposed by supplier-owners and irresponsible operation of retail outlets by supplier-owners with weak ties to the neighborhoods in which they operated.[10] The tied

---

8. In 1933, when the twenty-first amendment took effect, President Roosevelt established the Federal Alcohol Control Administration (the "FACA") under authority of the National Industrial Recovery Act (the "NIRA"). The FACA promulgated six Codes of Fair Competition for different sectors of the alcoholic beverage industry. When the Supreme Court struck down the NIRA in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), Congress quickly enacted the FAA Act. Congress used the Codes as a pattern for the FAA Act in order to limit the lapse in federal supervision of the industry. *See National Distributing*, 626 F.2d at 1004–06, 1010–12.

9. Notwithstanding the events that gave rise to this suit, there are some indications that the Bureau itself has recently come to a greater appreciation of this theme in the legislative history of the FAA Act. In publishing proposed regulations under section 5 in 1979, the Bureau indicated that the new regulations would "liberalize current interpretations of the FAA Act ... and update regulatory requirements to con-

form with acceptable modern business practice." The Bureau stated that "[s]ome trade practice areas [would be] deregulated" and expressed the hope that this would "stimulate competition." Notice of Proposed Rulemaking, 44 Fed.Reg. 45,298 (1979) (codified as amended 27 C.F.R. Parts 6, 8, 10 & 11 (1988)); *see, e.g.*, 27 C.F.R. §§ 6.81–.101 (1988) (exceptions to section 5(c) restrictions). To the extent that this deregulatory impulse proceeds from a view that the Bureau possesses general authority to promulgate legislative rules under section 5—in addition to the specific legislative authority conferred by subsections 5(b)(3) and 5(b)(6)—it is misguided. *See National Distributing*, 626 F.2d at 1018, 1019 & n. 68. However, the Bureau's view that the encouragement of competition is compatible with the purposes of the section 5 is nevertheless instructive.

10. The legislative history suggests that Congress was willing to balance its concern with these evils against other concerns. The Report of the Senate Committee on Finance, for example,

house provisions were expected to counter these evils by preventing "producers and wholesalers from imposing exclusive contracts or exclusive agencies upon formerly independent retailers." *Id.* at 1011. These aspects of the legislative history contributed to the D.C. Circuit's conclusion that price cuts do not violate section 5(b) unless they are accompanied by an agreement or understanding to exclude other suppliers' wares or by some reasonable prospect of domination or control of a retail outlet by the supplier.

■ The analysis of legislative history in *National Distributing* applies most persuasively to the specific question of nondiscriminatory price cuts. The court observed that when Congress drafted section 5(b) it omitted the authority over prices that had been provided in the Code of Fair Competition, an omission that weighed heavily against the Bureau's effort to read this authority back into the tied house provision. Other aspects of the *National Distributing* decision also pertain specifically to the enforcement action challenged there. The Bureau's unacknowledged and unexplained about-face on the legality of price cuts, *see National Distributing*, 626 F.2d at 1012–14, has no apparent analog in the Bureau's regulation of cooperative advertising. But these differences do not deflect the central thrust of the legislative history analysis contained in *National Distributing*. In view of Congress' clear approval of lower prices and its fundamental intention to prevent supplier *control* over retail outlets, rather than to interfere with a laundry list of disfavored transactions, we believe that "inducing" a retailer to deal with a particular supplier, "to the exclusion in whole or in part" of that supplier's competitors, as that language is used in subsection 5(b) and 5(c), must be construed to incorporate some threshold requirement.

In particular, we find that transactions between suppliers and retailers do not induce the "exclusion in whole or in part" of competing suppliers unless their purpose or potential effect is to lead to supplier control over ostensibly independent purchasers.

The Bureau contends that *Black v. Magnolia Liquor Co.*, 355 U.S. 24, 78 S.Ct. 106, 2 L.Ed.2d 5 (1957), compels a more expansive reading of section 5. *Black* involved contracts under which buyers seeking to purchase popular brands were required to purchase specified quantities of unpopular brands. The Court identified this as a form of tying, a practice "repeatedly condemned under the antitrust laws, since [it] serve[s] no purpose beyond the suppression of competition." *Id.* at 25, 78 S.Ct. at 108; *accord Distilled Brands, Inc. v. Dunigan*, 222 F.2d 867, 869 (2d Cir.1955) ("The Supreme Court has repeatedly characterized tie-in sales as monopolistic in purpose and effect."). The Court rejected the argument that these transactions did not involve sufficient vertical control to run afoul of section 5: "[W]e deal here with remedial legislation whose language should be given hospitable scope.... The will of Congress would be thwarted if we gave the language in question the strictest construction possible." *Black*, 355 U.S. at 26, 78 S.Ct. at 109. Apart from this broad reference to the need to give hospitable scope to the FAA Act, neither *Black* nor *Distilled Brands* discussed what threshold effect, if any, a supplier's business practices must have on the alcoholic beverage market to threaten the exclusion of another supplier's goods. There was no occasion for such a discussion. Under the then prevailing view, tying arrangements existed only to inhibit competition; this was the basis for the treatment of tying arrangements as per se antitrust violations.[11] Moreover, *Dis-*

stresses that the tied house provisions do not require suppliers to divest themselves of wholly owned retail outlets, or even to desist from establishing additional captive outlets. S.Rep. No. 1215, 74th Cong., 1st Sess. 7 (1935), *reprinted in* I Appendix of Defendants–Appellants at 299.

**11.** *Black* cited the broad condemnations of tying found in decisions such as *Standard Oil Co. v. United States*, 337 U.S. 293, 305–06, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949), and *International Salt Co. v. United States*, 332 U.S. 392, 394–96, 68 S.Ct. 12, 14–15, 92 L.Ed. 20 (1947). More recent Supreme Court decisions appear to have retreated from this stern position. *See, e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*

*tilled Brands* relied on an administrative determination that the petitioner's practices had resulted in "a substantial exclusion of other sellers." 222 F.2d at 870. These cases do not hold that every occurrence of a practice specified in the tied house and commercial bribery provisions, no matter how innocuous its motivation and how slight its effect, represents an inducement to a purchaser that will result in the "exclusion" of a competing supplier's goods.

None of the handful of other cases construing the tied house and commercial bribery provisions contradicts the proposition that whether a supplier induced a purchaser to exclude competing suppliers within the meaning of section 5 depends on the nature of the inducement and the nature and magnitude of the effect on competition. Cases upholding allegations of section 5 violations shed little light on this issue. *Levers v. Anderson,* 153 F.2d 1008 (10th Cir.), *cert. denied,* 328 U.S. 866, 66 S.Ct. 1376, 90 L.Ed. 1636 (1946), involved egregious violations by a wholesaler that "so dominated and controlled a substantial number of retail dealers, that the [dealers] were compelled to purchase substantially all their requirements" from that wholesaler. 153 F.2d at 1009. As in the tying cases, there was no need to delineate the threshold characteristics of a section 5 violation. *Stein Distributing Co. v. Department of the Treasury,* 779 F.2d 1407 (9th Cir.), *cert. denied,* 476 U.S. 1111, 106 S.Ct. 1963, 90 L.Ed.2d 649 (1986), affirmed a Bureau order suspending a liquor wholesaler's permit under authority of section 5(b). The wholesaler supplied diagrams and labor necessary to restock retailers' shelves, insuring in the process that its own brands ended up in the best locations. Characterizing this practice as "exactly the type of wholesaler influence" that section 5(b) seeks to prohibit, the court rejected the

wholesaler's argument that only practices specifically enumerated in section 5(b) violate the tied house provisions. 779 F.2d at 1412. Given Congress' hostility to vertical integration between distributors and nominally independent retailers, this kind of direct, exclusive and continuing involvement of a wholesaler in retailers' operations seems a reasonable target of section 5 enforcement. Thus, while *Stein Distributing* did not discuss the issues of congressional purpose that were explored in *National Distributing,* we do not think that the two cases are inconsistent.[12]

The two cases that have ruled in favor of suppliers accused of violating section 5 have been decided on other grounds. However, they contain some guidance concerning the requisite elements of a section 5 violation. *Brown Forman Distillers Corp. v. U.S. Treasury Department,* 591 F.2d 375 (6th Cir.1979), reversed an administrative determination that a distiller had willfully violated the commercial bribery provisions by providing prizes worth $600 for a two-month sales contest among a distributor's sales personnel. The distiller prevailed due to insufficient evidence of willfulness, but the court also questioned, before ultimately accepting, the administrative law judge's determination that commercial bribery had occurred. Specifically, the court found that "it strains logic to conclude that the offering of two inexpensive prizes to individual salesmen ... was a *significant factor* in the increased purchases." *Id.* at 377 (emphasis supplied). *American Distilling Co. v. Wisconsin Liquor Co.,* 104 F.2d 582, 585 (7th Cir.1939), concerned a contract action for the value of liquor sold and delivered to Wisconsin Liquor. The purchaser claimed that the contract was unenforceable because American Distilling had violated section 5 of the FAA

466 U.S. 2, 13–18, 104 S.Ct. 1551, 1558–61, 80 L.Ed.2d 2 (1984).

**12.** One district court opinion has held, contrary to *National Distributing,* that pricing below cost constituted a violation of section 5(b). *See Castlewood Int'l Corp. v. Simon,* 404 F.Supp. 88 (S.D.Fla.1975), *rev'd on other grounds,* 596 F.2d 638 (5th Cir.1979), *vacated and remanded sub nom. Miller v. Castlewood Int'l Corp.,* 446 U.S.

949, 100 S.Ct. 2914, 64 L.Ed.2d 806, *reinstated,* 626 F.2d 1200 (5th Cir.1980) (per curiam). However, that decision relied entirely on a published ruling by the Bureau that *National Distributing* convincingly showed was inconsistent with the purposes of the FAA Act. *Compare Castlewood,* 404 F.Supp. at 93, *with National Distributing,* 626 F.2d at 1012–14.

Act by giving small gifts to Wisconsin Liquor's employees. This court held for the plaintiff on the grounds that a violation of section 5, even if established, would not constitute a valid defense to the contract action. The court also took pains, *in dictum*, to cast doubt on the defendant's view of the breadth of section 5. The court acknowledged that the small gifts given by the plaintiff's agents were arguably encompassed by section 5(c)(2)'s reference to "any bonus, premium, or compensation," but suggested that these gifts might not have resulted in the exclusion of competing suppliers' wares to the extent required for a violation to be found. *Id.* at 585. Like *National Distributing*, these cases reflect an awareness of the practical absurdity of reading section 5 to proscribe *every* interaction that has any competitive effect (no matter how beneficial) and that is encompassed by the broad language of the subsections of 5(b) and 5(c).

The Bureau asserts, in effect, that Congress intended section 5 to be a hair-trigger enforcement weapon. In support of this proposition, the Bureau refers repeatedly to a statement in the Report of the House Ways and Means Committee: "The most effective means of preventing monopolies and restraints of trade in this industry is by prohibiting [tied house and related] practices, thereby striking at the causes for restraints of trade and monopolistic conditions and dealing with such conditions in their incipiency." H.R.Rep. No. 1542, 74th Cong., 1st Sess. 12 (1935), *reprinted in* I Appendix for Defendants–Appellants at 143. But a mandate to address real threats in their incipiency is not an instruction to disregard the distinction between friend and foe; it is not a mandate to control weeds by scorching the earth. We do not believe that an enforcement policy that attacks longstanding pro-competitive arrangements based on a threat of vertical integration as speculative as the one seen here is consistent with a tenable reading of the purposes of the FAA Act.

It is noteworthy that the House Report on which the Bureau relies also contains the statement that "[t]he practices here involved are analogous to those prohibited by the antitrust laws." *Id.; see also Black*, 355 U.S. at 25–26, 78 S.Ct. at 108 (citing House Report's reference to antitrust laws). Section 3 of the Clayton Anti-Trust Act, 15 U.S.C. § 14 (1982), the antitrust provision closest to the tied house and commercial bribery provisions of the FAA Act, prohibits sales or contracts for sale that are accompanied by an agreement or understanding to restrict dealings with the seller's competitors, "where the effect ... may be to substantially lessen competition or tend to create a monopoly." [13] This provision has been interpreted by the Supreme Court as having been intended " 'to reach the agreements embraced within its sphere in their incipiency.' " *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326, 81 S.Ct. 623, 627, 5 L.Ed.2d 580 (1961) (quoting *Standard Fashion Co. v. Magrane–Houston Co.*, 258 U.S. 346, 356, 42 S.Ct. 360, 362, 66 L.Ed. 653 (1922)). However, recognition that Congress intended for section 3 of the Clayton Act to nip monopolistic practices in the bud has not precluded courts from determining that only practices posing a substantial threat to competition violate this provision. *See, e.g., Tampa Elec.*, 365 U.S. at 327–29, 333, 81 S.Ct. at 627–29, 631; *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 392–94 (7th Cir. 1984).

Congress may have believed that there were especially compelling reasons for limiting vertical integration in the alcoholic beverage industry. It presumably would have relied on preexisting antitrust statutes to regulate vertical relationships in the industry if this view had not prevailed. On the other hand, if Congress had been as single-minded in its determination to wipe out vertical integration in the liquor industry as the Bureau maintains, it presumably would not have exempted retail outlets already owned by suppliers; nor would it have permitted additional outright acquisi-

---

**13.** We are unaware of any holding that price promotions like those at issue, without more, violate the antitrust laws.

tions. (*See* note 10 *supra.*) We do not necessarily equate the threshold standard under section 5 with the threshold standard under section 3 of the Clayton Act. We do believe, however, that the Clayton Act cases show that a congressional commitment to prophylaxis does not imply the abandonment of perspective.

Finally, the Bureau's regulations do not bolster its case against Foremost's operation. Section 6.52 specifies that when a supplier, in connection with a cooperative advertising campaign pays for advertising "placed by the retailer," that supplier pays for advertising within the meaning of section 5(b)(4). 27 C.F.R. § 6.52 (1987). But this regulation does not address the magnitude of the effect that a given cooperative arrangement must exert or threaten to exert to run afoul of the tied house provisions. Section 6.98 of the regulations permits producers and distributors to list retailers in advertisements, provided that such listings are "relatively inconspicuous" and there is no mention of price. 27 C.F.R. § 6.98 (1988). Though this regulation suggests that the Bureau views certain practices as falling below the statutory threshold, it does not purport to parse the critical phrase "exclusion in whole or in part." Moreover, the Bureau's legislative rule-making authority under section 5 is limited to defining the scope of subsections 5(b)(3) and 5(b)(6). Regulations not issued under these specific authorities are interpretive. *See National Distributing*, 626 F.2d at 1018–19 & n. 68. Thus, these sections, even if relevant to the issue at hand, would be authoritative only insofar as they embodied a valid interpretation of the statutory standard.

The Bureau's views of the statutory provisions at issue here, whether embodied in its interpretive regulations or in its enforcement policies, are certainly entitled to deference commensurate with its experience and expertise. But the weight accorded an agency's view in this context depends upon "the thoroughness evident in its consideration, the validity of its reasoning ...

and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). In view of our reading of the purposes of the FAA Act, we find the theory underlying the enforcement policies at issue quite unpersuasive. *See also National Distributing*, 626 F.2d at 1019.

## IV.

■ We arrive, then, at the conclusion that the limitations on section 5 discussed in *National Distributing* are not confined to the special case of nondiscriminatory price discounts. For purposes of the tied house and commercial bribery provisions, "exclusion, in whole or in part," of competing suppliers occurs only when the purpose or potential effect of some vertical transaction is to allow a supplier to exercise substantial control over a purchaser. We are left, however, with the question whether suppliers' contributions to Foremost's advertising programs have this purpose or effect. The district court stated that *National Distributing* controlled this case, but did not discuss the legal standard in any detail due to its factual finding that Foremost's promotions had no effect on the sale of nonfeatured items. This finding, as we have seen, was inappropriate at the summary judgment stage given the conflicting evidence that was before the court on this point. While there was evidence that sales of nonfeatured items declined, it does not appear that the competitive benefit obtained by Foremost subscribers had either the purpose or effect of allowing them to exercise substantial control over Foremost franchisees.

There seems, in fact, to be little to distinguish Foremost's promotions from the price cuts at issue in *National Distributing*. Both programs enhanced price competition, an effect consistent with Congress' intent to bring about lower liquor prices.[14] Neither program places particu-

---

**14.** Some of the difficulties inherent in the effort to construe statutes by reference to the intentions of a bygone legislature are particularly evident in this case. We must identify the central aims of the 74th Congress in enacting the FAA Act, aims which were closely linked to the

lar retailers under a continuing obligation to a particular supplier or suppliers. Foremost franchisees, like the retailers who purchased discounted wine from National Distributing, may purchase the promoted items or not, as they wish; Foremost exercises no legal control over the franchisees' purchasing decisions. Franchisees can also end their affiliation with Foremost whenever they wish, eliminating whatever compulsion they may feel to meet customer expectations produced by the Foremost ads. Foremost's promotions may appear to be more exclusive than the nondiscriminatory price cut in *National Distributing* inasmuch as only Foremost franchisees benefit from the subscribing suppliers' advertising payments. However, Foremost had a number of subscribing suppliers, and there does not appear to be any evidence that suppliers who wished to participate were turned away. These factors make it unlikely that Foremost's operation has the purpose or effect of affording participating suppliers substantial control over Foremost retailers.

Despite these appearances, we are reluctant to affirm the summary judgment for Foremost. Because relatively few cases have been tried under section 5, the district court had little guidance. While its description of the legal standard was not incorrect, neither was it precise. The parties therefore did not brief this court on whether the lengthy record in this case supports summary judgment under the appropriate legal standard. Moreover, the district court's entry of summary judgment for Foremost was based on an apparent misreading of the record. Under the circumstances, we think it appropriate to remand to the district court to reassess the summary judgment motions under the standard announced here and to conduct further proceedings if appropriate. Circuit Rule 36 shall not apply.

### V.

The decision of the district court is AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

nation's experiences during Prohibition and its immediate aftermath, and give effect to those purposes at a time when both the problems and the prevailing methods of theorizing about vertical economic relationships have changed markedly. In 1935, Congress favored lower prices as a means of reducing the profits of trading in black market liquor. Today, more than a half-century later, black market liquor sales are not thought to pose the same threat to federal revenues or to provide the same encouragement to organized crime. Most present-day advocates of price competition in the sale of alcoholic beverages would stress potential benefits to consumers (or, as a fall-back position, the inefficiency of sustaining high prices by handicapping price competition rather than by increasing excise taxes). The declining significance of the social evils that caused the 74th Congress to favor lower prices might counsel against relying too heavily on this aspect of the FAA Act's legislative history. Similar observations, however, apply to Congress' intent to arrest vertical integration involving liquor wholesalers and ostensibly independent retailers "in its incipiency." The concerns that made the 74th Congress particularly sensitive to vertical integration in this area, perceptions of the peculiar social evils of tied houses, were also creatures of the Prohibition era. We do not believe that the aspect of the legislative history that the Bureau stresses, emphasis on preemptive regulation of vertical integration, has aged any more gracefully than the aspect that favors Foremost, agreement on the importance of lowering prices.